## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

| | | |
|---|---|---|
| DUNCAN MOORE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:09-cv-00273 |
| | ) | |
| TALLAHASSEE MEMORIAL | ) | |
| HEALTHCARE, INC. | ) | |
| A Florida non-profit corporation, | ) | |
| | ) | |
| Defendants. | ) | |

## MUTUALLY AGREED FILING OF THE
## ADMINISTRATIVE RECORD

Plaintiff, Duncan Moore and Defendant, Tallahassee Memorial HealthCare, Inc. ("TMH"), hereby file the Administrative Record created in the evaluation of the claim for benefits of Plaintiff, Duncan Moore ("Moore"), and the resultant appeal from the benefit determination. The attached Administrative Record constitutes the documents considered by the TMH Supplemental Executive Retirement Program ("SERP") Claims Committee and the TMH SERP Appeal Committee in determining Moore's entitlement to benefits under the TMH SERP pursuant to the claims procedure prescribed in 29 U.S.C. § 1133 and 29 C.F.R. § 2560.503-1. The parties hereby stipulate to the admission of the Administrative Record into evidence in this matter.

Respectfully submitted,

HOLLAND & KNIGHT LLP                        AUSLEY & McMULLEN, P.A.


s/ Paul E. Parrish                          s/ Kenneth R. Hart
PAUL E PARRISH                              KENNETH R. HART
Fla. Bar No. 373117                         Fla. Bar No. 0192580
STEPHEN H. GRIMES                           RUTH E. VAFEK
Fla. Bar No. 0032005                        Fla. Bar No. 0034220
HOLLAND & KNIGHT LLP                        AUSLEY & McMULLEN, P.A.
100 N. Tampa Street, Suite 4100             P. O. Box 391
Tampa, FL 33602                             Tallahassee, FL 32302
P.O. Box 1288                               Telephone: (850) 224-9115
Tampa, FL 33601-1288                        Fax: (850) 222-7560
Phone: 813-227-8500                         AND
Fax: 813-229-0134                           S. JONATHAN VINE
Paul.parrish@hklaw.com                      FBN 0010966
                                            RACHEL BEIGE
Attorneys for Plaintiff                     FBN 0016366
                                            COLE, SCOTT & KISSANE, P.A.
                                            1645 Palm Beach Lakes Blvd.2nd Floor
                                            W. Palm Beach, FL 33401
                                            Telephone: (561) 383-9203
                                            Fax: (561) 683-8977

                                            Attorneys for Defendant

000002

# ADMINISTRATIVE RECORD

THE DOCUMENTS CONSIDERED BY THE TMH SUPPLEMENTAL EXECUTIVE RETIREMENT PROGRAM CLAIMS COMMITTEE AND THE TMH SUPPLEMENTAL EXECUTIVE RETIREMENT PROGRAM APPEAL COMMITTEE IN EVALUATING DUNCAN MOORE'S CLAIM FOR BENEFITS UNDER THE TALLAHASSEE MEMORIAL HOSPITAL, INC.'S SUPPLEMENTAL EXECUTIVE RETIREMENT PLAN.

*CONFIDENTIAL*
*PRIVILEGED/WORK PRODUCT INFORMATION*

## M E M O R A N D U M
*(Note: Index of Attachments follows this Memorandum)*

TO:        Plan (Benefits Review) Committee
                Board of Directors
                Tallahassee Memorial Healthcare, Inc.

FROM:     Ed Moore

cc:            Roberta Casper Watson
                John Perry Thomas

DATE:     April 28, 2006

---

**Preface.** This committee is charged with the responsibility of making the initial decision regarding retirement benefits claimed by TMH's former CEO, Duncan Moore. Mr. Moore's claim was filed by Certified Letter dated November 10, 2005 (**Attachment No. 1**). The Committee is functioning under the authority and auspices of the TMH Supplemental Executive Retirement Plan (as Restated on April 21, 2004), provisions of ERISA (Employee Retirement Income Security Act of 1974, as amended), and the delegated authority of the Board. The Committee's charge is to determine the appropriate retirement benefit. In discharging its obligation under ERISA[1] to determine the appropriate benefit, the committee is not making a decision in the Board's or TMH's best interest, but, rather, after review of all relevant information, is to make an objective decision as to what benefit the claimant is entitled under "the Plan." For this purpose, the "Plan" is not confined to the Restated Plan adopted by the Board, but rather includes all actions taken by TMH which may impact the claimed benefit. This memorandum will provide the essential relevant information, as well as copies of supporting documents, believed to be necessary and appropriate in order for the Committee to provide a fair and objective review of the claimed benefit. Subsequently, at a comprehensive Committee meeting scheduled for May 8, 2006, this Committee may deliberate, ask questions, seek additional information or other support as it may need to reach its fair and objective decision.

**Introduction.** Duncan Moore is the former CEO of Tallahassee Memorial Healthcare, Inc. ("TMH"). His employment commenced January 29, 1988 and terminated in June 2003. Shortly after termination of his employment, additional information relating to his

---

[1] It is not clear whether the committee actually has ERISA fiduciary status in making this determination, but Roberta Watson and I are recommending that the committee adhere to the standards that would be applicable if the committee members are determined to be ERISA fiduciaries.

and others' potential claims for retirement benefits began to surface. (Some, if not most of that information was previously available; however, the full import, including the financial impact of the potential claims, was not fully known by the TMH Board and auditors until the fall of 2003. Some additional relevant information and documents were not available until recently.)

TMH previously conducted a comprehensive review and investigation of the facts and circumstances relevant to the claim or claims asserted by Mr. Moore. The response of the 2004 Board to all such benefit claims is set forth in **Tallahassee Memorial Healthcare, Inc. Supplemental Executive Retirement Plan, as amended and restated effective as of October 1, 2003, Restated SERP - Attachment No. 2).** The Restated Plan was adopted by the Board subsequent to Mr. Moore's retirement and, thus, is not directly binding upon him but may be considered by this committee as that Board's effort to determine and resolve the claims for retirement benefits. Additionally, by the filing of his benefit claim, Mr. Moore is (or is assumed to be) contending that the benefits as set forth in the Restated Plan (and the Restated Plan's limitations on those benefits) do not encompass the full benefit to which he is entitled.

In his claim (**Attachment No. 1**), Mr. Moore asserts that the Employment Agreement dated October 17, 2000 (**Attachment No. 3**) is the operative plan and that he is entitled to the benefits set forth in paragraph 3.7 of that 2000 Employment Agreement.

Section 3.7 of that 2000 Employment Agreement describes the "Supplemental Executive Retirement Program (SERP)." The committee's essential charge then becomes to determine what benefits Mr. Moore is entitled to under the SERP. (As used here, the "SERP" is synonymous with the broad definition of "the Plan.") The SERP, while addressed in the 2000 Employment Agreement, has its genesis in, and is impacted by actions of the Board, Board committees and Board officers as expressed in various documents and meetings, which include minutes and correspondence of the 1998 Compensation Committee of the Board, the 1998 Employment Agreement, the 2000 Employment Agreement and the Agreement Regarding Early Retirement and Termination of Employment. (All such documents are attached and will be subsequently discussed and referenced.) As set forth above, while there may be some subsequent litigation assertions to the contrary, it is believed appropriate for this committee to review all facts, circumstances and documents relating to the claimed retirement benefits in reaching its conclusion as to the appropriate benefit to be paid.

**Board Precedent Regarding Approval of CEO and Executive Compensation.** While current corporate governance best practices require full and complete disclosure, third party objective support, Board discussion, action and documentation with respect to executive compensation, such was not the culture or practice at TMH during the relevant

2

periods. A review of Board and Executive Committee minutes, as well as other available documentation, shows that for the entire period of Duncan Moore's employment, and perhaps well before that time, CEO compensation, and to some extent that of other senior executives, was addressed in a highly confidential manner, often with the Chairman of the Board making a unilateral decision after such review as he deemed appropriate. Sometimes, the Chairman included others, principally Executive Committee members or Board officers. During this time period, 1988 to post 2000, there is no record in Board or Executive Committee minutes of any compensation decision or action. (The assumed justification for the truncated process is confidentiality.) While legal arguments may be advanced to the contrary, it is suggested that the lack of full Board and/or Executive Committee approval does not in and of itself obviate the legal obligations arising from such TMH commitments. The lack of full corporate documentation does, however, accentuate the necessity for a determination of the understanding and intent of the parties at the time the written expressions were generated.

**1988 Employment Agreement.** Mr. Moore was employed by Tallahassee Memorial Healthcare, Inc.'s predecessor, Tallahassee Memorial Regional Medical Center, Inc. (hereinafter collectively referred to as "TMH") on January 29, 1988, pursuant to a written Employment Agreement (**Attachment No. 4**) executed as of that date. The 1988 Employment Agreement provides in part: "2. Compensation. In consideration for these services as stated above, the Medical Center shall pay to Moore an amount mutually agreed upon at an annual review of his compensation by the Executive Committee of the Board, said amount not in any event to be less than the previous year's salary. Moore may, at his option, request and require that such portion of his salary as he may designate be set aside as tax-deferred income subject to the requirements of the Internal Revenue Service (IRS) . . . ."[2]) Other "benefits" provided by the 1988 Employment Agreement included:

>        a $1 million life insurance policy;
>        health insurance as made available to TMH employees;
>        general liability insurance coverage;
>        retirement benefits as made available to other TMH employees;
>        a new automobile every three years, including adjustment for any tax impact of provision of the automobile;
>        a disability insurance policy at 60% of base pay;
>        free medical exam per year;
>        dues to professional organizations, societies, service organizations and

---

[2] It later became clear that legislation had made such "discriminatory" plans ineligible for tax-deferred treatment. Nevertheless, Mr. Moore's arrangement, which TMH picked up from his prior employer, was treated, for purposes of administering the 1988 Agreement, as though it did fit with IRS requirements during the entire period of Mr. Moore's employment by TMH.

000006

> clubs as may be approved by the Chairman of the Board of Directors;

> vacation and sick leave time in accordance with TMH personnel policies for each year of employment;

> additional time to attend professional meetings, attend to outside professional duties as may be initially agreed by the Chairman, such time to be fully compensated service time;

> reimbursement for all expenses incident to the attendance at such meetings.

The 1988 Employment Agreement further provides that, in the event of termination without cause, TMH is to pay one year's salary and, if subsequent to the first year's employment, a year's salary plus an additional month's salary for each year of accumulated employment. The 1988 Employment Agreement contained a one-year non-compete provision. Mr. Moore's performance was to be annually reviewed by the Board of Directors.

From his initial employment in 1988 to the comprehensive revision of his employment contract in 1998 (described below), Duncan Moore's compensation was periodically reviewed and increased (see **Attachment No. 5**). As set forth above, there is no record of Board or Executive Committee approval of such changes. Some Board chairmen advise that oral reports were made to the Executive Committee most often without any, or with little, dollar information being given to the Executive Committee.

*1998 Compensation Reviews, Actions and Documents:* The relevant 1998 activity actually commenced in late 1997 with a contact between Duncan Moore and Paul M. Flood, CEO of Chattahoochee Health Resources, Inc. ("CHR"). CHR is a healthcare consulting organization founded and chaired by Paul M. Flood, engaging in various forms of healthcare consulting, including executive compensation. Mr. Flood and his firm have extensive experience in providing consulting services to hospitals and healthcare associations, principally in Georgia, but also including Florida, Alabama and Mississippi. The circumstances surrounding the 1998 Compensation Committee and the interaction of consultant, Paul M. Flood, are reported in some detail since that committee initially approved a SERP benefit for four senior executives at TMH. It is that SERP benefit, impacted by subsequent TMH actions, which is the core of the benefit claim. Mr. Flood was interviewed by Ed Moore and Roberta Watson, and the representations as to his statements are taken from that interview. The referenced documentation was provided by him or was otherwise taken from TMH files.

Mr. Flood had a previous relationship with Duncan Moore's predecessor CEO, M. T. Mustian. Mr. Flood also knew Duncan Moore while Mr. Moore was CEO of Phoebe Putney Hospital in Albany, Georgia. In late 1997 or early 1998, Duncan Moore called

4

Mr. Flood, advising that he, Duncan Moore, was redoing his employment contract and was particularly interested in retirement compensation issues. Mr. Flood advises that his first contact with Duncan Moore on this issue was probably in late 1997, with a subsequent first meeting with Duncan Moore only, followed by some additional phone conversations, and thereafter an introduction to the 1998 Compensation Committee. The then Board officers in spring of 1998, Dr. John Lewis, Chairman, Dr. Tom Lawhorn, Mr. Brent Pichard and Mr. Chuck Mitchell, were constituted by Chairman Lewis as a Compensation Committee of the Board. (Reference to "Compensation Committee" is to this 1998 Committee.) (Note: Duncan Moore's 1998 Employment Agreement provides that the Executive Committee of the Board, then consisting of the Board officers only, was to review and make compensation decisions relating to Duncan Moore. In 1998, the Executive Committee included individuals other than the Board officers.) Ed Moore and Roberta Watson also interviewed all members of the 1998 Compensation Committee and relevant information from those interviews is referenced herein.

Mr. Flood asserts that in his consulting relationships he represents the Board of Directors and not the CEO or any subset of executives. According to Mr. Flood's recollection, supported by that of the Compensation Committee members, Duncan Moore was not present during the substantive discussions between Flood and the Compensation Committee members.

Mr. Flood's advice, in response to Duncan Moore's initial inquiry, was that an overall retirement plan should be developed for Duncan Moore and included in his employment contract. Mr. Flood further suggested that goals and objectives should be established, along with some incentive compensation based upon achievement of those goals. However, Duncan Moore, according to Mr. Flood, advised that he did not want any of his compensation to be put "at risk" since he was already receiving generous compensation and there was no reason (in his mind) to jeopardize that with an incentive requirement. There is no indication that the Committee pursued the possibility of an incentive arrangement that would have put Mr. Moore's compensation at risk based on performance goals.

Attached as **Attachment No. 6** is a letter dated September 11, 2003 from Mr. Flood to Mark O'Bryant, CEO, TMH, wherein Mr. Flood transmits copies of what he determines to be relevant documents in his file along with a cover letter containing a brief commentary with respect to those documents. The documents are copied in color so that Mr. Flood's notes made in red may be distinguished from his other notes. Mr. Flood advised that the red notes were made as reminders to himself of matters to be emphasized during the meeting or, in some cases, to note items approved by the Committee.

5

000008

While there is a great deal of information contained in these documents, as well as the additional documents referenced below, it is important to focus attention on the two issues at the core of this matter: 1) Is the approved retirement plan a *shortfall plan* containing a setoff for pension plan and social security benefits? And, 2) What is the appropriate *definition of compensation* to be used in calculating the retirement benefit target?

Before proceeding further, a brief discussion of SERPs may be useful. Since most qualified retirement or pension plans have a compensation cap for the purpose of calculating retirement benefits, the more highly paid senior executives, absent some other provision, would not achieve retirement benefits commensurate with the level of their compensation. Various forms of supplemental executive retirement plans have been devised over the years. One of the more typical approaches, as has been used in this circumstance, is to establish a target benefit, calculate the retirement benefits already in place, and then provide a supplement to those existing retirement benefits which, when added to the existing benefits, will cause the executive to reach the target retirement benefit. If a qualified pension plan plus social security provides non-executive employees with a retirement benefit equal to 65% (for example) of average compensation, then the objective of the SERP may be to bring the highly compensated senior executives to that level. Generally, it is perceived that such plans are equitable and address the compensation caps found in qualified retirement plans (most all SERPs are non-qualified plans with the associated IRS implications). An additional justification for such plans is they are thought to provide an incentive for the executive to remain employed until the target retirement date, at which time the supplemental benefit becomes fully vested and available to him. Typically, such plans include a vesting schedule with some, and according to Mr. Flood most, plans giving credit in the vesting calculation to prior employment service. In this case, Duncan Moore had 10 years of service at the time the Committee approved the benefit. According to the vesting schedule, he was awarded a 50% target at that time, with the target increasing to 65% after 15 years of service.

Mr. Flood recommended a plan with the following features:

     1)     target benefit after ten years of service, equal to 50% of the average "compensation" for the five highest years;

     2)     after fifteen years of service, the target benefit increases to 65% of the average compensation for the five highest years;

     3)     the actual benefit is a supplemental payment which would allow the executive to achieve the described percentage when added to existing retirement benefits

6

(Social Security and TMH's qualified pension plan). In other words, the target benefit, say 65%, is to be offset by the amount of the pension plan benefit and social security payments, resulting in a supplemental or "shortfall" payment of the difference.

As stated above, the two principal issues for this Committee are: 1) Is this a shortfall plan whereby pension plan and social security benefits are deducted from the target, or is it a plan promising a benefit equal to the full amount determined by the stated formula? And, 2) What is the appropriate definition of compensation to be used in calculating the average on which the target is based?

During his interview, Mr. Flood stated that he never considered, proposed or discussed with the Compensation Committee any form of benefit other than a shortfall plan; that is, all of his discussions were premised upon the reduction of the target benefit by existing retirement benefits, i.e., pension plan and social security payments. All Committee members also affirmed, without any reservation, that their discussion and approvals were of a shortfall plan. As will be later discussed, the 1998 Employment Agreement (**Attachment No. 7**), which first incorporates and describes the SERP, does not in its primary text reference a setoff in the attached Committee minutes; however, the materials attached to those minutes clearly show that the Committee's deliberations were based on a setoff or shortfall plan. The 2000 Employment Agreement (which incorporated the terms of the SERP directly into the body of the document and does not include the Committee material as an attachment), makes no reference to the shortfall or setoff; therefore, it is possible that Mr. Moore is claiming a full benefit with no setoff. (It is not clear at this point whether Duncan Moore's claim is asserting a claim for the target benefit without the setoff.)

The examples prepared by Mr. Flood in his letters to the committee all use base salary as the compensation upon which the target is calculated. The match provided by TMH of the portion of Duncan Moore's salary that he elected to defer, as well as other "benefits" – country clubs, cars, insurance, accrued sick leave, and accrued personal leave time – are not included in the calculations provided by Mr. Flood. Mr. Flood says that he did not provide the Committee with calculations based upon anything other than base salary; however, he does state that he recalls discussing with the Committee other potential definitions of compensation that could be used for that purpose. He advises that the notation on his material, "Form 990," was a reminder to him to discuss with the Committee the possible inclusion of all forms of compensation in the SERP calculation base. (For those not familiar with Form 990, it is a comprehensive, annual IRS filing made by non-profits, which essentially replaces a 1040 or other income tax return.) The relevance of Form 990 to this issue is that Form 990 requires the disclosure of all payments to certain key executives. Included in such disclosure on Form 990, with respect to Duncan Moore, is salary, pension plan benefit, country and service clubs, the

7

match of the deferred portion of his compensation, personal automobile, etc. – see **Attachment No. 8**. This then draws the second and financially most significant issue into focus. Is the retirement benefit to be calculated on base salary only? If so, as set forth in **Attachment No. 5**, the average salary for the five highest years for Mr. Moore would be $424,800. If Mr. Moore's retirement benefit is to be based on all payments "as reported on Form 990," the average of his five highest years then becomes $609,966. While there are alternative positions to be asserted, such as inclusion of benefits but not the deferred match (since that is itself a form of retirement benefit), these two figures characterize the difference in the TMH acknowledged benefit based upon salary only and Mr. Moore's potential claim based on all payments reported on Form 990. The retirement benefit formula in each case would be 65% of that average. If the plan is determined to be a shortfall plan, that target number would be reduced by pension plan and social security benefits, which total $56,721, resulting in the TMH acknowledged benefit, as set forth in the Restated Plan, of $219,400. Mr. Moore's broadest claim is a retirement benefit of 65% of $609,966, or a benefit of $396,497, with no setoff. If the setoff is applied to this number, the benefit then becomes $339,777.

As the Committee reviews the 1998 Compensation Committee documents as well as the subsequent employment agreements and related documents, it is with the objective of determining the plan benefit provided by TMH. Again, "the Plan," for this purpose, includes all relevant facts, circumstances, and the documents taken as a whole.

While Mr. Flood states that he discussed with the 1998 Compensation Committee members alternative compensation definitions, the Compensation Committee, to a man, has no recollection of such discussions. Mr. Flood says he is confident that some discussion took place but that the Committee never expressed any interest in doing anything other than a plan based on base salary only. The Compensation Committee members also state that they had no idea until the recent interviews that payments other than base salary were reported on Form 990. Again, Mr. Flood advises that in referencing, in his notes, "Form 990," he did not mean that he was proposing Form 990 as a definition of compensation, but was reminding himself to point out to the Committee that there were other forms of compensation reported on that form. The Committee members also advised that they thought a benefit based on base compensation was generous enough and they would not have considered increasing the benefit to include additional forms of compensation.

**1998 Employment Agreement.** Mr. Flood also states that during the time of the 1998 Compensation Committee meetings and deliberations, Duncan Moore was very interested in securing an expanded definition of compensation for the SERP formula, and that he continued to have discussions with Mr. Flood about a more expansive definition. Duncan Moore's discussions in this regard were apparently confined to Mr. Flood and did not

8

include the Compensation Committee members. Again, this may be a point of factual contention. Mr. Flood advised that even after the Committee approved the SERP benefit on September 23rd (**Attachment No. 6**), Duncan Moore still was "pushing" to include the other Form 990 compensation elements. Again, the Committee members state that they have no recollection of discussing anything other than base salary. Mr. Mitchell remembers numerous conversations with Mr. Moore in which Mr. Moore expressed satisfaction, and gratitude, for the benefit calculated using base salary.

Mr. Flood had a phone conversation with Duncan Moore on or after October 15, wherein Duncan Moore advised that the Board officers had approved changes to his employment agreement, which included a definition of compensation to include all forms of compensation reported on Form 990. See letter "G", **Attachment No. 6**. The Committee members say they have no recollection of even discussing anything other than base salary and are adamant that they would have thought anything else to be excessive. Mr. Flood seems to recall a conversation with Dr. John Lewis regarding compensation definitions, but doesn't have specific recall about such conversation. Dr. Lewis recalls no such discussion, but also cautions that his recollections are not such that he could deny ever having such a discussion. There is also reference in the material to an alternative reason for using the Form 990 language. Some of Duncan Moore's base salary was allocated to, and paid by, corporate affiliates of TMH. It is necessary to aggregate Duncan Moore's salary from all such entities in order to utilize his total salary in the formula. It is clear from the materials presented to (and adopted by) the officers as part of the Compensation Committee action in September of 1998 that Mr. Moore's base salary from all the entities was intended to be included in the SERP formula. Information as to salary paid by all such affiliated entities is included on Form 990.

Included in the Flood documentation, as part of Exhibit G (**Attachment No. 6**) is a draft revised employment contract, which specifically includes as part of the highlighted changes the expanded Form 990 definition for retirement compensation. The cover memorandum from Gail Seals states that significant proposed changes were highlighted (italicized) for the Committee members. According to Ms. Seals' memorandum (included in **Attachment 9**) and her statements, the four Board officers were provided the package, which included the revised Employment Agreement, so that the Board officers could address all proposed changes to the contract in a meeting to follow an Executive Committee meeting on October 14. The cover letter from Duncan Moore to Mr. Flood transmitting a copy of that document states that the Board officers approved all the changes with the exception of severance and termination, which were subsequently addressed by the Committee and incorporated into the final 1998 contract.

**Attachment No. 9** is a series of documents from the files of Gail Seals, which provide some further information regarding the transmittal of the 1998 draft employment contract

9

to the Board officers. Ms. Seals advises that she typed the draft contract at Duncan Moore's instructions and included the italicized sections at Dr. John Lewis' suggestion to highlight the significant changes. (We are not aware of who made the decision as to what constituted a significant change, but the compensation definition was included as an italicized significant change.)

We have been unable to locate any documentation referencing the Board officers' actions with respect to the 1998 employment contract other than the included materials. Dr. Lewis acknowledges that he executed the final 1998 employment contract (**Attachment No. 7**). His recollection is that the final document was brought to his office by Duncan Moore. The witnesses to the contract are Dr. Lewis' employees.

While Ms. Seals' material, her recollections, Duncan Moore's cover letter to Paul Flood of October 15, and Mr. Flood's recollection of the subsequent phone conversation, all support the premise that the Board officers reviewed and approved the draft 1998 Employment Agreement, the Board officers have no independent recollection of such a meeting and action nor are there any Board minutes or Executive Committee minutes referencing any such action. Also, there is no indication that the Board officers were made aware at any time, by Mr. Flood, Duncan Moore or otherwise, of the financial significance to TMH of the definition change as related to the calculation of retirement benefits.

Minutes of Compensation Committee meeting held on October 21, 1998 (**Attachment No. 10**) reflect that the Committee had further correspondence and discussion with Mr. Flood concerning the severance and termination provisions. The Committee, at that meeting, authorized amendment of Mr. Moore's employment contract to: 1) establish the severance period at 36 months, and 2) redefined termination for cause as set forth and edited in Mr. Flood's letter of October 19. The Committee further approved a motion that any "termination for cause" would be narrowly construed and that the employment contract amendment was to protect him financially from cavalier termination by the Board.

The 1998 Agreement contained a provision similar to the 1988 Employment Agreement regarding the establishment of Moore's compensation: ". . . shall pay to Moore an amount mutually agreed upon at an annual review of his compensation by the Executive Committee or Compensation Committee of the Board." With the exception of the provision relating to retirement benefits, the recitation of benefits in the 1998 Employment Agreement is substantially the same as in the 1988 Employment Agreement.

10

After the significant 1998 actions of the Compensation Committee and the execution of the revised 1998 Employment Agreement incorporating the SERP obligation, there were no official references in committee minutes, no notification to auditors and no financial statement provisions made with respect to such obligations. Five annual audit periods elapsed before the auditors were advised in late 2003, after Duncan Moore's retirement, of the existence of the SERP obligations, which were calculated at September 30, 2003 to require a financial statement provision of $5,200,000 for all four participants. Duncan Moore was CEO at TMH during all but the last few weeks of the entire period prior to the notification to auditors.

***October 2000 Employment Agreement:***   Mr. Moore's contract was again revised in October 2000 – **Attachment No. 3** . Major provisions include:

Section 2.1, Base Salary, establishes a base salary of $438,000 per annum, with increases as provided in accordance with the terms of this Employment Agreement. The compensation provision acknowledges Mr. Moore's capacity to defer a portion of this base salary and includes the following:  "TMH will continue to match and pay to the deferred compensation plan an equal amount to that deferred by Employee."

Section 2.2, Annual Review, provides that Mr. Moore's base salary will be reviewed "by the Compensation Committee of the Board of Directors of TMH in good faith based upon Employee's performance . . ."

The definition of "Base Compensation" (Section 2.3) is essentially a carryover from the 1998 Employment Agreement: "the total of: salary and benefits as submitted to the Internal Revenue Service on Form 990 for the component or affiliated organizations of Tallahassee Memorial Healthcare, Inc., e.g., Tallahassee Memorial Healthcare, TMH Foundation, Southeast Community Health Services, Tallahassee Memorial Health Ventures, and any other components or affiliates; and, to include other salary *and benefits received by Employee which are below the threshold amounts required for inclusion on Form 990."* (Italicized language was added.)  Bill Giudice, CFO of TMH, recalled being requested by Duncan Moore to provide some information as to a source document that would contain all elements of Mr. Moore's compensation. Mr. Giudice provided to Mr. Moore a draft provision, which is essentially the change incorporated into the 2000 contract. Mr. Giudice says that he may have had an earlier conversation around the time of the 1998 Employment Agreement with Mr. Moore, discussing Form 990 as a reference, which would include all forms of compensation paid to Mr. Moore.

The automobile provision was modified to provide Mr. Moore a new automobile every two years plus an option on the part of Mr. Moore to purchase the automobile after the 2-

11

year period for $1, with Moore's compensation to be "grossed up" to cover the income tax expense associated with the purchase.

The provisions of the SERP, as approved by the 1998 Compensation Committee and included in the 1998 Employment Agreement, were incorporated into the body of the 2000 Employment Agreement as Section 3.7. The SERP language incorporated into the 2000 Employment Agreement tracked the language of the 1998 Committee minutes and did not include a reference to a setoff. (Recall that the 1998 reference to setoff was included in the letters from Paul Flood that were attached to the minutes, but not in the text of the actual minutes.) The 2000 Employment Agreement was drafted by Ed Moore, TMH's General Counsel, based upon information and documents provided by Mr. Moore, which included the 1998 Employment Agreement with proposed revisions marked by Mr. Moore.

The termination without cause and resignation for good reason paragraphs were significantly revised and committed TMH to pay, if Moore's employment was terminated without cause, or if he resigns for good reason, his base compensation for three years following the date of termination or resignation. The definition of "cause" for the purpose of termination of employment was modified to include the following condition: ". . . shall be narrowly construed in favor of Employee so that Employee is protected financially from termination as a result of unpopular decisions or actions taken by Employee in good faith in the discharge of Employee's duties, which actions were later determined to be unpopular, ill-advised or politically unacceptable."

The 2000 Employment Agreement contains, as did all the predecessor agreements, a provision for attorney's fees: "7.10, Attorney's Fees. The prevailing party in any litigation arising out of this agreement shall be entitled to reasonable attorney's fees and costs through and including any appeal, from the other party."

The 2000 Employment Agreement contains a provision committing TMH "to match and pay to the deferred compensation plan an equal amount to that deferred by Employee." The 1998 Employment Agreement provided only that Mr. Moore could set aside such portion of his salary as "he may designate be set aside as tax deferred income." The commitment to match, however, had its genesis in earlier approvals by various Board Chairmen and/or Compensation Committees. (See attached **Attachment No. 11.**) There is no record in Executive Committee or Board of Directors' minutes regarding the match of deferred compensation. The amount of the deferred match is a reportable item on IRS Form 990 filed each year by TMH. The amount of the deferred compensation match paid by TMH to Mr. Moore's deferred compensation trust ranged averaged $112,500 for the highest 5 years. See **Attachment No. 5.**

12

By letter dated October 17, 2000 (**Attachment No 12**), the then Chairman of the Board, Chuck Mitchell, expressed to Mr. Moore the Compensation Committee's review of his performance. Mr. Moore was congratulated on a number of initiatives as well as his leadership on several critical issues. The Compensation Committee commended Mr. Moore "on a job well done" and approved an increase of $12,000 per year in salary. The Committee also "agreed to allow you (Mr. Moore) to take early retirement beginning at age 62 in the event you are terminated without cause; at the same time you agreed to extend the age of your retirement from 65 to 67. This reflects our confidence in you and our desire to see you continue to work at TMH beyond age 65."

In that same letter, Chairman Mitchell then requested of Mr. Moore "that a complete copy of your reviews and contracts be kept with each year's current Chairman of the Board, and passed along during each year's Compensation Committee meeting."

There is no reference in the Board minutes or Executive Committee minutes to any review and approval of the terms of the 2000 Employment Agreement. Chuck Mitchell, Chairman of the Board at the time, executed the 2000 Employment Agreement. Mr. Mitchell also recalls conversations with Duncan Moore regarding Mr. Moore's retirement benefits. Mr. Mitchell's recollection is that all such conversations assumed a retirement benefit calculated by using base salary only and that Mr. Moore felt very generously rewarded with that benefit.

*Agreement Regarding Early Retirement and Termination of Employment.* On January 29, 2003, a document styled "Agreement Regarding Early Retirement and Termination of Employment" (**Attachment No. 13**) was executed by TMH and Duncan Moore. The document references Duncan Moore's desire to take early retirement and notes expiration of the current term to be October 17, 2008. The agreed upon terms of the 2003 Agreement include termination of Mr. Moore's employment as of June 23, 2003, a statement that SERP payments are to begin June 23, 2003, along with severance payments equal to 35% of base compensation (recall that the SERP payment is 65% of base compensation), and continued participation during the severance period in health, medical and life insurance programs and plans. The impact of the retirement agreement upon compensation was to require the same payments as would have been made under the 3-year severance provision (assuming the SERP calculation is based on the average of base salary), that is, 100% of base compensation to be calculated under the Retirement Agreement as an early SERP payment (65% of base compensation) with the remaining 35% of base compensation being characterized as severance. (It is Ed Moore's recollection that the 3-year payments were structured in this fashion to provide further support for the "early retirement" decision. Since Mr. Moore's retirement, however, TMH has taken the position that the net effect of the "severance" provision is the same as a continuation of the 2000 Employment Agreement provision relating to severance

13

(continuation of final base compensation for 3 years), and payments have been made to and accepted by Mr. Moore on that basis.

The 2003 Retirement Agreement further provides that Moore shall have no claim for compensation or benefits other than as set forth in the 2000 Employment Agreement as modified by the Retirement Agreement and in existing retirement/benefit programs to which Employee is a party.   The 2003 Retirement Agreement reconfirms TMH's obligation to pay benefits as set forth in the 2000 Employment Agreement.

There are subcommittee minutes of the Compensation Committee recommending approval of the 2003 Retirement Agreement (**Attachment No. 14**):  "It is therefore recommended that the existing Employment Agreement between Tallahassee Memorial Healthcare, Inc. and Duncan Moore be modified as set forth in document entitled 'Agreement Regarding Early Retirement and Termination of Employment.'"     At a special meeting of the Board of Directors of TMH (**Attachment No. 14**), the Board adopted an approving resolution with the relevant portion being "that the Board with thanks for the 15 years of unquestioned commitment to the hospital and community and for the many positive accomplishments during Mr. Moore's 15-year tenure, accept Mr. Moore's request for retirement commencing June 23, 2003; and, further, that the existing Employment Agreement dated October 17, 2000 be amended as recommended by the Subcommittee and as set forth in Agreement Regarding Early Retirement and Termination of Employment between Tallahassee Memorial Healthcare, Inc. and Duncan Moore.  After full discussion, the motion to approve the Subcommittee recommendation and amend the Employment Agreement, as set forth, was approved with one Board member dissenting.  (The dissenting Board member apparently did not agree that Mr. Moore's employment should be terminated (based on remarks made by the member at the meeting).    While as outlined above, the Board and its Committee approved the Retirement Agreement, there is no reference in any Board or Committee material to a review of the actual amount of the SERP benefit.

*Other Relevant Information:*  During the period from "approval" of the SERP benefit by the "Compensation Committee" in September 1998 to and through the late summer of 2003, no specific disclosures were made to TMH auditors, TMH bond counsel or, indeed, the TMH Board of the existence of the SERP commitments.  Please note that the SERP commitments were, however, referenced and described, although perhaps not adequately, in the 1998 and 2000 Employment Agreements for Mr. Moore and in amendments to employment agreements for the four senior vice-presidents dated in 2001.    (The amendments for the three senior vice-presidents were executed, on behalf of TMH, by Mr. Moore as CEO.)  None of the Employment Agreements, 1998 and 2000 for Mr.

14

Moore and the amendments for the Senior Vice-Presidents, were maintained in files made available to the auditors.

No financial statement provision was made for the expected expenses associated with the SERP program until full disclosure of the plan and all of its ramifications were made to the Board and TMH auditors after Mr. Moore's and two of the senior vice-presidents' retirements in 2003. After review of the facts and circumstances surrounding the SERP commitments, the then Board of Directors made a financial statement provision of $3,290,000 as of September 30, 2003, to cover all anticipated expenses associated with SERP commitments to the then four participants.

Carney, Brafford and Giudice SERP

As set forth in the 1998 Compensation Committee material, the Committee, in 1998, approved a SERP benefit, not only for Duncan Moore, but for three other senior executives: COO Ed Carney, CFO Bill Giudice and Senior Vice-President Ron Brafford. No further documentation of the SERP benefits for Mr. Brafford and Mr. Giudice appear until their respective employment agreements were amended under date of January 17, 2001 (**Attachment No. 15**). Bill Giudice states that Duncan Moore provided to him a draft of the amendment, which Mr. Giudice then converted into a final document. The amendments do not include a reference to setoff, and the definition of compensation includes "fringe benefits."

Duncan Moore provided the relevant terms and requested that General Counsel, Ed Moore, include in Dr. Carney's revised employment agreement a SERP provision. That employment agreement (**Attachment No. 16**) includes a SERP benefit having a setoff and uses base salary only in calculating the target benefit. Relevant terms of Dr. Carney's SERP were provided by Duncan Moore.

When the financial import of these earlier commitments became fully known to the TMH Board, after retirement of Duncan Moore, Dr. Carney and Ron Brafford, settlement discussions were initiated in an effort to resolve the potential claim for SERP benefits and to otherwise address any other outstanding claims. Those discussions were successful with respect to Dr. Carney, Mr. Giudice and Mr. Brafford, with the three individuals executing settlement agreements pursuant to which the individuals waived any claims to a SERP benefit in exchange for other compensation. The other compensation included, in the case of Dr. Carney and Mr. Brafford, a cash payment and an increase in pension benefits, and in Mr. Giudice's case an increase in his pension benefit only. Similar settlement discussions were had with Duncan Moore's counsel, but have resulted in no agreement. The financial costs of the settlements with the three individuals were covered

15

by the 2003 financial statement provision and, in some cases, a supplemental one-time provision.

IRS Issues

In late 2004 and early 2005 in the context of settlement discussions with Mr. Moore's counsel, questions were raised regarding the potential characterization of benefits to be paid under the SERP as an "excess benefit" transaction pursuant to Section 4958, IRC. In addition, the adoption of the Restated SERP in April 2004 and the 1998 SERP approval, raised the issue of income tax reporting consequences.

After consultation with a compensation consultant and tax advisor, the TMH Board concluded that the payment of any supplemental benefit, other than that contemplated by the Restated SERP approved February 2004, would be problematic and raise the issue of a possible "excess benefit." The Restated SERP providing for a retirement benefit equal to 65% of base salary, reduced by pension benefit and social security payments, may enjoy the presumption of reasonableness described in IRS regulations since that plan was approved by the Board "Compensation Committee" based upon advice of a third party consultant (Mr. Flood). On August 15, 2005, TMH filed its 2004 Form 990, which included a disclosure Statement 33 regarding the Restated SERP and attendant circumstances. Statement 33 reaffirms the disclosures and the amended 2002 and 2003 Form 990's, discussed below; advises the IRS that as of August 2005 there's only one eligible beneficiary; and puts the IRS on notice that Duncan Moore may assert additional claims, which, if successful, might be classified as an "excess benefit." The 2002 and 2003 Form 990's were amended to add disclosures regarding the existence of the Restated SERP and the annual cost attributed thereto. Note that, in speaking with Ed Moore and Roberta Watson, Paul Flood indicated that a benefit based on 990 compensation could likely have been defended. However, he never presented back-up materials to the Committee to support a benefit other than one calculated on base salary.

In addition to the 990 reporting issues, it was also necessary to address the income tax reporting consequences of the Restated Plan under Section 457, IRC. The initial 2004 W-2 provided to Duncan Moore in early 2004 did not include any amounts to be paid under the Restated SERP (adopted April 2004). TMH's tax consultants advised that a non-profit is required to report the present value of such potential stream of future payments as current income to the beneficiary when such future payments are no longer subject to a "reasonable risk of forfeiture" (even though such payment stops at death). The income tax issue is potentially complicated, in part, because a claim could be made that taxable income, based on the 50% target formula, should have been reported in 1998 when the benefit was approved. The IRS requires that the present value of that anticipated income stream for the life expectancy of the beneficiary be included in the

16

beneficiary's current income (the mortality issue affects the present value, but does not itself constitute a "reasonable risk of forfeiture"). On August 15, 2005, Duncan Moore was provided an amended W-2 for 2004, which includes, as part of his taxable income, the present value of all anticipated future payments under the revised SERP. That present value total is $2,103,161.

*Conclusion:* The 1998 Board officers, sitting as the Compensation Committee of the Board, committed TMH to a SERP program which entitled Mr. Moore to additional retirement benefits. The Committee took its action in good faith with the understanding that it was in the best interest of TMH that Mr. Moore be provided an additional retirement benefit and that such benefit be structured in a fashion that would encourage him to remain employed by TMH. The question before this Committee is what is the proper way to calculate such retirement benefit? Is the calculation of the target to be based on base salary only? Is the calculation to include all additional compensation elements reported on Form 990? Is the calculation to include some but not all of the additional elements reported on Form 990? And, after the proper calculation of the target is resolved, is the target benefit to be offset by existing retirement benefits -- pension plan and social security?

The relevant portions of Form 990 for the last five years of Mr. Moore's employment are attached as **Attachment No. 8.** An examination of those forms will show that Form 990 includes: a) base salary, b) pension benefits, c) the employer match of deferred compensation, d) fringe benefits, including car, fuel, insurance, country club, civic clubs and, more significantly, accrued personal leave time and accrued sick leave (accumulated over Mr. Moore's 15 years of employment). With respect to the latter, accrued sick leave and accrued personal leave time, TMH has long had a policy of paying accrued sick leave and accrued personal leave time in cash at retirement. In Mr. Moore's case, those accruals total $189,738, which, if included in his compensation total for the year 2003, and thus in the calculation of the average, have a significant impact on the result.[3] The various permutations are included as shown on **Attachment No. 5.**

As expressed at the outset, this Committee's charge is to determine the appropriate retirement benefit to be paid to Mr. Moore. In doing so, you must consider what is believed to be all of the relevant documents, facts and circumstances. Your decision should not be based upon the financial welfare of TMH, but, rather, should be made in the exercise of your good faith ERISA obligation to determine the appropriate benefit.

---

[3] Note that such accumulated leave, when paid to rank-and-file employees in their year of termination, is included in calculating their pension plan benefit accruals. A similar calculation of pension plan benefits would be made for executives, but because of the annual compensation cap under qualified pension plans, does not usually increase the qualified pension benefit of a highly compensated executive such as Mr. Moore.

17

# I N D E X
## (Revised)
### Attachments 1 through 17 are to the
### Memorandum to Plan (Benefits Review) Committee of TMH

| Attachment No. (Tab) | Description of Attachment | Referred to on Page No.(s) |
|---|---|---|
| 1 | Duncan Moore's Claim Letter November 10, 2005 | 1, 2 |
| 2 | TMH Supplemental Executive Retirement Plan, as amended and restated effective 10/1/03 ("Restated SERP") | 2 |
| 3 | Duncan Moore's 2000 Employment Agreement | 2, 11 |
| 4 | Duncan Moore's Employment Agreement dated 1/29/88 | 3 |
| 5 | Comprehensive Schedule of Duncan Moore's compensation and various possible computations of the SERP benefit | 4, 8, 12, 17 |
| 6 | Letter dated 9/11/03 from Mr. Flood to Mark O'Bryant, wherein Mr. Flood transmits copies of relevant documents from his file | 5, 9 |
| 7 | Duncan Moore's 1998 Employment Agreement dated October, 1998 | 7, 10 |
| 8 | Form 990 disclosure of Duncan Moore's total compensation | 8, 17 |
| 9 | Series of documents from Gail Seals' files | 9 |
| 10 | Minutes of 1998 Compensation Committee | 10 |
| 11 | Letters approving deferred match | 12 |
| 12 | Letter dated 10/17/00 from Chuck Mitchell to Duncan Moore | 13 |

| Attachment No. (Tab) | Description of Attachment | Referred to on Page No.(s) |
|---|---|---|
| 13 | Agreement Regarding Early Retirement and Termination of Employment dated 1/29/03 between TMH and Duncan Moore | 13 |
| 14 | Subcommittee Minutes of the Compensation Committee recommending approval of the 2003 Retirement Agreement, and Minutes of Special Meeting of Board of Directors | 14 |
| 15 | Amendments to Employment Agreements of Ron Brafford and Bill Giudice | 15 |
| 16 | Employment Agreement of Dr. Ed Carney including SERP benefit | 15 |
| 17 | SERP Claim Committee Letter dated May 21, 2006 | |

**Additional Attachments – SERP Appeal Committee – Meeting of September 25, 2007**

| | | |
|---|---|---|
| 18 | Duncan Moore's Appeal Letter dated August 7, 2006 | |
| 19 | Letter dated September 13, 2006 to Paul E. Parrish, Esq. from Ms. Roberta Casper Watson | |
| 20 | Memorandum dated September 21, 2006 from Ed Moore to the SERP Appeal Committee with attachments | |
| 21 | Memorandum dated September 21, 2006 from Kenneth Hart and Ruth Vafek re Contract Law | |
| 22 | IRS Form 990's – 1999 – 2004 | |
| 23 | TMH Financial Statements 1999 – 2005 | |
| 24 | Representation Letters re Annual Audit and Closing Certificate re Bond Issue | |

**Additional Attachments – SERP Appeal Committee – Meeting of March 27, 2007**

| 25 | Written Questions Propounded to Duncan Moore |
|---|---|
| 26 | Duncan Moore's Response to Written Questions |
| 27 | Affidavit of Paul M. Flood |
| 28 | Affidavit of John R. Lewis |
| 29 | Affidavit of J. Brent Pichard |
| 30 | Affidavit of Thomas I. Lawhorn |
| 31 | Affidavit of Edgar M. Moore |
| 32 | Letter from Chuck Mitchell to Duncan Moore |
| 33 | Affidavit of Chuck Mitchell |

**Additional Attachments – SERP Appeal Committee – Meeting of April 17, 2007**

| 34 | Affidavit of Gail Seals |
|---|---|
| 35 | Letter from Paul Parrish Responding to Affidavits |
| 36 | Revised Schedule 5 (Various Possible Computations) |
| 37 | Affidavit of William Giudice (provided to Appeal Committee subsequent to April 17, 2007 meeting) |
| 38 | SERP Appeal Committee Letter dated May 15, 2007 |
| 39 | RECORD SUPPLEMENT (Agreed to by the Parties) Letter (w/attachments) from William Giudice dated May 10, 2004 Letter (w/attachments) from William Giudice dated June 29, 2006 |

**Attachment No. 1**

Duncan Moore's Claim Letter
November 10, 2005

000024

**Holland+Knight**

Tel  813 227 8500
Fax  813 229 0134

Holland & Knight LLP
100 North Tampa Street, Suite 4100
Tampa, FL 33602-3644
www.hklaw.com

Paul E. Parrish
813-227-6657
paul.parrish@hklaw.com

November 10, 2005

**CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

Plan Administrator
Tallahassee Memorial Healthcare, Inc.
1300 Miccosukee Road
Tallahassee, FL  32308-5093

> Re:  Duncan Moore/Claim for Pension Benefits

Dear Madam or Sir:

Duncan Moore has retained my law firm, Holland & Knight LLP, to contact you in regard to his pension benefits that are due under the Supplemental Executive Retirement Program ("SERP"). I am the ERISA litigation specialist at Holland & Knight LLP. My specific purpose for writing is to assert and file a formal claim for those benefits pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, et seq.

I understand that Mr. Moore and his representatives have previously engaged in discussions with Tallahassee Memorial concerning Mr. Moore's pension benefits. According to what I have been told, the Plan claims that the benefits to which Mr. Moore is entitled are spelled out in the "Tallahassee Memorial Healthcare, Inc. Supplemental Executive Retirement Plan (as Amended and Restated effective as of October 1, 2003)". Neither the law nor facts support that claim.

Instead, the Employment Agreement between Tallahassee Memorial and Mr. Moore dated October 17, 2000 ("2000 Employment Agreement"), remains the operative Plan. The 2000 Employment Agreement contains no language authorizing the Plan to amend or terminate the benefits set forth therein. Mr. Moore complied with his obligations under the 2000 Agreement by, among other things, working until retirement. The "Agreement Regarding Early Retirement and Termination of Employment ("Termination Agreement") is clear on that point. Further, the Termination Agreement acknowledges that Mr. Moore "is fully vested under the SERP and is entitled to, and **shall** receive, the amount of the benefit set forth in . . . the 2000 Employment Agreement." [emphasis added] Under such circumstances, Tallahassee Memorial cannot amend the Plan to provide less compensation than that set out in the 2000 Employment Agreement. *See, e.g., In re New Valley Corporation,* 89 F.3d 143 (3rd Cir. 1996).

Annapolis • Atlanta • Bethesda • Boston • Bradenton • Chicago • Fort Lauderdale • Jacksonville • Lakeland • Los Angeles
Miami • New York • Northern Virginia • Orlando • Portland • Providence • Rancho Santa Fe • Sacramento • St. Petersburg
San Antonio • San Francisco • Seattle • Tallahassee • Tampa • Washington, D.C. • West Palm Beach
Beijing • Caracas* • Helsinki* • Mexico City • Tel Aviv* • Tokyo • *Representative Office

Tallahassee Memorial Healthcare, Inc.
November 10, 2005
Page 2

As a result of the foregoing, Mr. Moore is entitled to the benefits set forth in paragraph 3.7 of the 2000 Employment Agreement. We demand payment of said benefits at this time.

In addition, please furnish me with the appropriate Form 990s for the last ten years of Mr. Moore's employment, along with all documents that would reflect on "other salary and benefits received by [Mr. Moore] which are below the threshold amounts required for inclusion on the Form 990." In addition, we request all documents that would reflect on both salary and benefits received by Mr. Moore which are above threshold amounts required for inclusion on Form 990 that were not included on the Form 990. Finally, please provide any and all additional documentation that reflects on the value of salary or other benefits received by Mr. Moore pursuant to his employment with Tallahassee Memorial.

Thank you for your attention to this matter. Should you have any questions, please feel free to contact me.

Very truly yours,

Paul E. Parrish

PEP/lmf

cc:    Mr. Duncan Moore
       Steve Grimes, Esq.

       Chairman, Board of Directors
       Magnolia & Miccosukee Road
       Tallahassee, FL 32308

#3351146_v1

000026

## Attachment No. 2

TMH Supplemental Executive
Retirement Plan, as amended
and restated effective 10/1/03
("Restated SERP")

TALLAHASSEE MEMORIAL HEALTHCARE, INC.

SUPPLEMENTAL EXECUTIVE RETIREMENT PLAN

(As Amended and Restated Effective as of October 1, 2003)

000028

# TALLAHASSEE MEMORIAL HEALTHCARE, INC.
## SUPPLEMENTAL EXECUTIVE RETIREMENT PLAN

## TABLE OF CONTENTS

**SECTION**                                                                   **PAGE**

**ARTICLE I   INTRODUCTION** .................................................................1

    Section 1.1     Purpose .........................................................................1
    Section 1.2     Effective Date ...............................................................1
    Section 1.3     Notices..........................................................................1
    Section 1.4     Supplements .................................................................1

**ARTICLE II   DEFINITIONS**.................................................................1

    Section 2.1     "Average Monthly Compensation" ..............................1
    Section 2.2     "Base Compensation" ..................................................1
    Section 2.3     "Board" ........................................................................1
    Section 2.4     "Committee"................................................................1
    Section 2.5     "Company"...................................................................1
    Section 2.6     "Defined Benefit Plan" ...............................................2
    Section 2.7     "Effective Date"...........................................................2
    Section 2.8     "Employee" ..................................................................2
    Section 2.9     "For Cause" ..................................................................2
    Section 2.10    "Monthly Offset Amount".............................................2
    Section 2.11    "Normal Retirement Date".............................................2
    Section 2.12    "Original Effective Date"..............................................2
    Section 2.13    "Participant" .................................................................2
    Section 2.14    "Plan" ...........................................................................2
    Section 2.15    "Plan Year"...................................................................2
    Section 2.16    "Subsidiary" or "Subsidiaries" ...................................2
    Section 2.17    "Surviving Spouse"......................................................3
    Section 2.18    "Years of Vesting Service" ..........................................3

**ARTICLE III   ELIGIBILITY AND PARTICIPATION** ........................................3

**ARTICLE IV   SUPPLEMENTAL BENEFITS**.................................................3

    Section 4.1     Retirement Benefit .......................................................3
    Section 4.2     Normal Retirement.......................................................3
    Section 4.3     Deferred Retirement.....................................................3
    Section 4.4     Early Retirement..........................................................3
    Section 4.5     Death ............................................................................4
    Section 4.6     Actuarial Equivalents and Assumptions .....................4
    Section 4.7     Special Rules Upon Involuntary Termination.............4

i

ARTICLE V      DISTRIBUTIONS..................................................................................4

    Section 5.1    Time of Payment of Benefits.................................................4
    Section 5.2    Manner of Payment of Benefits..............................................4

ARTICLE VI     FUNDING ........................................................................................5

ARTICLE VII    PLAN ADMINISTRATION..........................................................5

    Section 7.1    Administration by the Committee ..........................................5
    Section 7.2    Powers and Responsibilities of the Committee.....................5
    Section 7.3    Liabilities..............................................................................6
    Section 7.4    Claims Procedure..................................................................6
    Section 7.5    Income and Employment Tax Withholding ...........................7

ARTICLE VIII   AMENDMENT AND TERMINATION OF THE PLAN..........................7

    Section 8.1    Amendment of the Plan.........................................................7
    Section 8.2    Termination of the Plan.........................................................7

ARTICLE IX     MISCELLANEOUS .........................................................................7

    Section 9.1    Governing Law......................................................................7
    Section 9.2    Headings and Gender ............................................................8
    Section 9.3    Participant's Rights; Acquittance .........................................8
    Section 9.4    Spendthrift Clause.................................................................8
    Section 9.5    Counterparts ..........................................................................8
    Section 9.6    No Enlargement of Employment Rights................................8
    Section 9.7    Limitations on Liability.........................................................8
    Section 9.8    Incapacity of Participant or Surviving Spouse .....................8
    Section 9.9    Successors .............................................................................8
    Section 9.10   Evidence.................................................................................9
    Section 9.11   Action by Company ...............................................................9
    Section 9.12   Severability............................................................................9

000030

# ARTICLE I
## INTRODUCTION

Section 1.1    Purpose.  The purpose of this Plan is to provide supplement retirement benefits for a select group of management or highly compensated Employees of the Company should other retirement benefits fall below a certain level.  It is the intention of the Company that the Plan will constitute an unfunded arrangement maintained for the purpose of providing deferred compensation for a select group of management or highly compensated employees for federal income tax purposes and for purposes of Title I of the Employee Retirement Income Security Act of 1974, as amended.  Consequently, it will be administered and its provisions interpreted consistently with that intention.

Section 1.2    Effective Date.  The Plan was originally established by the Company effective October 1, 1998.  The Plan is being amended and restated effective as of October 1, 2003.

Section 1.3    Notices.  Any notice or document required to be given or filed with the Company or Committee will be properly given or filed if delivered or mailed, postage paid, to Tallahassee Memorial HealthCare, Inc., 1300 Miccosukee Road, Tallahassee, Florida 32308-5093.

Section 1.4    Supplements.  The provisions of the Plan may be modified by supplements to the Plan.  The terms and provisions of each supplement are a part of the Plan and supersede any other provisions of the Plan to the extent necessary to eliminate any inconsistencies between the supplement and any other Plan provisions.

# ARTICLE II
## DEFINITIONS

Whenever the initial letter of the following words or phrases is capitalized in this Plan document, those words or phrases will have the meanings stated below unless a different meaning is plainly required by the context:

Section 2.1    "Average Monthly Compensation" means the Participant's average monthly Base Compensation over the five consecutive full Plan Years which produce the highest monthly average.

Section 2.2    "Base Compensation" means, for any Plan Year, the base salary paid to a Participant by the Company during that Plan Year (including any base salary that, but for a salary deferral election made under a Section 401(k), 403(b) or 125 plan maintained by the Company, would have been paid to the Participant by the Company).

Section 2.3    "Board" means the Board of Directors of the Company.

Section 2.4    "Committee" means the Compensation Committee of the Board.

Section 2.5    "Company" means Tallahassee Memorial HealthCare, Inc.

Section 2.6    "Defined Benefit Plan" means the Pension Plan of Tallahasse Memorial HealthCare, Inc., as amended from time to time, and any other qualified defined benefit pension plan maintained by the Company at any time either before or after the Original Effective Date.

Section 2.7    "Effective Date" means October 1, 2003.

Section 2.8    "Employee" means any individual who is employed by the Company.

Section 2.9    "For Cause" means a termination described in the Participant's employment contract with the Company as "for cause," or, if the Participant's employment contract does not define that term, one of the following: (i) the willful and continued failure of a Participant to perform his required duties as an officer or employee of the Company, (ii) any action by a Participant which involves willful misfeasance or gross negligence, (iii) the conviction of the Participant of the commission of any criminal offense which involves dishonesty or breach of trust, or (iv) any intentional breach by the Participant of a material term, condition or covenant of any agreement between the Participant and the Company.

Section 2.10    "Monthly Offset Amount" means the monthly payment amount that is actuarially equivalent to the sum of (i) the benefits provided to the Participant under the Defined Benefit Plan and (ii) the Social Security benefits provided to the Participant. The benefits provided to the Participant for purposes of the preceding sentence will be determined as of the first day of the month following the date the Participant's employment with the Company has terminated and projected forward to age 65, if the benefits payable under this Plan commence prior to the Participant's Normal Retirement Date.

Section 2.11    "Normal Retirement Date" means the first day of the month coincident with or next following the day the Participant attains age 65.

Section 2.12    "Original Effective Date" means October 1, 1998.

Section 2.13    "Participant" means a salaried executive Employee of the Company who becomes a Participant pursuant to the provisions of Article III of the Plan.

Section 2.14    "Plan" means the deferred compensation plan embodied herein, as amended from time to time, known as the Tallahassee Memorial HealthCare, Inc. Supplemental Executive Retirement Plan.

Section 2.15    "Plan Year" means the 12-month period beginning each October 1 and ending on the following September 30.

Section 2.16    "Subsidiary" or "Subsidiaries" means a corporation, partnership or limited liability company, a majority of the outstanding voting stock, general partnership interests or membership interest, as the case may be, of which is owned or controlled directly or indirectly, by the Company or by one or more other Subsidiaries. For the purposes of this definition, "voting stock" means stock having voting power for the election of directors, or trustees, as the case may be, whether at all times or only so long as no senior class of stock has such voting power by reason of any contingency.

2

Section 2.17  "Surviving Spouse" means the spouse to whom the Participant was married on both the day he is credited with ten Years of Vesting Service and the day of his death.

Section 2.18  "Years of Vesting Service" means the years of vesting service credited to the Participant under the Defined Benefit Plan, beginning with the plan year of the Defined Benefit Plan that coincides with or ends in the Plan Year the Participant first becomes a Participant in this Plan. Consequently, service prior to the Original Effective Date will not be counted under this Plan.

## ARTICLE III
## ELIGIBILITY AND PARTICIPATION

A member of a select group of management or highly compensated Employees is eligible to become a Participant in the Plan provided the Employee is designated as a Participant by the Board or Committee in writing. A designated Employee will become a Participant as of the later of the Original Effective Date or the date specified by the Board or Committee. Duncan Moore (referred to as "Moore"), Ronald Brafford, Edward Carney and William Guidice will be Participants in this Plan beginning on the Original Effective Date. A Participant may be removed as an active Participant by the Board or Committee effective as of any date, so that he will not be entitled to receive benefit accruals under Article IV on or after that date.

## ARTICLE IV
## SUPPLEMENTAL BENEFITS

Section 4.1  Retirement Benefit. The retirement benefit to be provided under this Plan is a monthly retirement income, commencing on the Participant's Normal Retirement Date and ending at his death. The monthly retirement income amount will equal 50 percent of the Participant's Average Monthly Compensation less the Monthly Offset Amount. For Moore, the percentage under the preceding sentence will be increased from 50 percent to 65 percent. Further reductions and actuarial adjustments, if any, will be made from this amount.

Section 4.2  Normal Retirement. A Participant whose employment with the Company terminates on or after his 65th birthday but on or before his Normal Retirement Date will be entitled to the retirement benefit determined under Section 4.1 commencing on his Normal Retirement Date.

Section 4.3  Deferred Retirement. A Participant whose employment with the Company terminates after his Normal Retirement Date will be entitled to the retirement benefit determined under Section 4.1, but commencing on the first day of the month following his termination date. No actuarial adjustment will be made as a result of payments commencing after the Participant's Normal Retirement Date.

Section 4.4  Early Retirement. A Participant whose employment with the Company terminates before his 65th birthday will be entitled to the retirement benefit determined under Section 4.1 commencing on his Normal Retirement Date (and not his earlier termination date). However, the benefit will be payable only if the Participant had accrued at least ten Years of Vesting Service on or prior to his termination date.

000033

Section 4.5    Death. If a Participant dies before receiving any payments under this Plan (regardless of his Years of Vesting Service), then the Participant's Surviving Spouse will be entitled to receive a monthly benefit under this Plan which will be equal to 50 percent of the monthly benefit determined under Section 4.1 that would have been payable to the Participant. The monthly benefit will be actuarially equivalent to the benefit that would have provided to the Participant on his Normal Retirement Date (using his Average Monthly Compensation as of the date of his death). If the Participant dies after receiving one or more payments of his benefit, a monthly benefit equal to 50 percent of the benefit he was receiving will be paid to his Surviving Spouse. No benefit will be paid under this Section until the first day of the month following the date the Surviving Spouse attains age 60.   Upon the earlier of the Surviving Spouse's death or marriage to another individual, all benefits will cease.

Section 4.6    Actuarial Equivalents and Assumptions. For purposes of determining actuarially equivalent benefits under the Plan, a six percent interest rate and the 1983 Group Annuity Mortality Table (50% Male/50% Female) will be used. For purposes of determining the Monthly Offset Amount in the event of a pre-Normal Retirement Date payment, six percent earnings rate will be used to project benefits from termination of employment to age 65. The Company may establish any other reasonable actuarial procedures and assumptions to determine the benefit payable to any Participant under this Plan.

Section 4.7    Special Rules Upon Involuntary Termination. In the event the Company terminates a Participant's employment, the Participant will become fully vested in his Plan benefit regardless of his Years of Vesting Service, unless the termination was For Cause.

## ARTICLE V
## DISTRIBUTIONS

Section 5.1    Time of Payment of Benefits. The benefit payable to a Participant under Section 4.2, 4.3 or 4.4 will begin to be distributed at the Participant's Normal Retirement Date or, if later, as provided in Section 4.3, or within a reasonable period following the applicable date. The benefit payable to a Surviving Spouse under Section 4.5 will begin to be distributed upon the later of the first day of the month following the Participant's death or the first day of the month coincident with or following the Surviving Spouse's 60th birthday. If the payments commence prior to the Participant's Normal Retirement Date, they will be reduced to reflect the early commencement of the payment. The reduction will equal 1/240 for each full calendar month, up to 120, the commencement precedes the Normal Retirement Date.

Section 5.2    Manner of Payment of Benefits. The benefit payable under Article IV will be distributed in cash in monthly payments payable on the first day of the calendar month, with the last payment to be made for the month in which the Participant or Surviving Spouse dies or, if applicable, in which the Surviving Spouse remarries.

4                          · 000034

## ARTICLE VI
### FUNDING

The Plan at all times will be unfunded and will constitute a mere promise by the Company to make benefit payments in the future. No provision of the Plan will impose or be deemed to impose any obligation upon the Company, other than an unsecured contractual obligation to make a cash payment to Participants and their beneficiaries in accordance with the terms of the Plan. Benefits payable under the Plan will be paid directly by the Company from its general assets. Notwithstanding any other provision of this Plan, neither a Participant nor his Surviving Spouse will have any preferred claim on, or any beneficial ownership interest in, any assets of the Company prior to the time benefits are paid as provided in Article IV. All rights created under this Plan will be mere unsecured contractual rights of the Participant against the Company.

## ARTICLE VII
### PLAN ADMINISTRATION

Section 7.1   Administration by the Committee. The Committee will be responsible for administering the Plan. Except as the Company may otherwise expressly determine, the Committee will be charged with the full power and the responsibility for administering the Plan in all its details.

Section 7.2   Powers and Responsibilities of the Committee.

(a)   The Committee will have all powers necessary to administer the Plan, including the power to construe and interpret the Plan documents; to decide all questions relating to an individual's eligibility to participate in the Plan; to require information from a Participant or Surviving Spouse; to determine whether a Participant has actually terminated employment; to determine whether the termination was or was not For Cause; to determine the amount, manner and timing of any distribution of benefits or withdrawal under the Plan; to resolve any claim for benefits in accordance with Section 7.4, and to appoint or employ advisors, including legal counsel, to render advice with respect to any of the Committee's responsibilities under the Plan. Any construction, interpretation, or application of the Plan by the Committee will be final, conclusive and binding. Consequently, benefits under this Plan will be paid only if the Committee decides in its discretion that the applicant is entitled to them.

(b)   Records and Reports. The Committee will be responsible for maintaining sufficient records to determine each Participant's eligibility to participate in the Plan, and the Base Compensation of each Participant for purposes of determining the amount of benefit to be accrued by or on behalf of the Participant under the Plan.

000035

(c)   <u>Rules and Decisions</u>. The Committee may adopt such rules as it deems necessary, desirable, or appropriate in the administration of the Plan. All rules and decisions of the Committee will be applied uniformly and consistently to all Participants in similar circumstances. When making a determination or calculation, the Committee will be entitled to rely upon information furnished by a Participant or Surviving Spouse, the Company or the legal counsel of the Company.

(d)   <u>Application and Forms for Benefits</u>. The Committee may require a Participant or Surviving Spouse to complete and file with it an application for a benefit, and to furnish all pertinent information requested by it. The Committee may rely upon all such information so furnished to it, including the Participant's or Surviving Spouse's current mailing address.

Section 7.3   <u>Liabilities</u>. The Committee will be indemnified and held harmless by the Company with respect to any actual or alleged breach of responsibilities performed or to be performed hereunder.

Section 7.4   <u>Claims Procedure</u>.

(a)   <u>Filing a Claim</u>. Any Participant or Surviving Spouse may file a written claim for a Plan benefit with the Committee or with a person named by the Committee to receive claims under the Plan.

(b)   <u>Notice of Denial of Claim</u>. In the event of a denial or limitation of any benefit or payment due to or requested by any Participant or Surviving Spouse under the Plan ("claimant"), the claimant will be given a written notification containing specific reasons for the denial or limitation of his benefit. The written notification will contain specific reference to the pertinent Plan provisions on which the denial or limitation of his benefit is based. In addition, it will contain a description of any other material or information necessary for the claimant to perfect a claim, and an explanation of why such material or information is necessary. The notification will further provide appropriate information as to the steps to be taken if the claimant wishes to submit his claim for review. This written notification will be given to a claimant within 90 days after receipt of his claim by the Committee unless special circumstances require an extension of time for processing the claim. If such an extension of time for processing is required, written notice of the extension will be furnished to the claimant prior to the termination of that 90-day period, and such notice will indicate the special circumstances which make the postponement appropriate.

(c)   <u>Right of Review</u>. In the event of a denial or limitation of his benefit, the claimant or his duly authorized representative will be permitted to review pertinent documents and to submit to the Committee issues and comments in writing. In addition, the claimant or his duly authorized representative

6                              000036

may make a written request for a full and fair review of his claim and its denial by the Committee; provided, however, that such written request must be received by the Committee (or its delegate to receive such requests) within 60 days after receipt by the claimant of written notification of the denial or limitation of the claim. The 60-day requirement may be waived by the Committee in appropriate cases.

(d)   Decision on Review. A decision will be rendered by the Committee within 60 days after the receipt of the request for review, provided that where special circumstances require an extension of time for processing the decision, it may be postponed on written notice to the claimant (prior to the expiration of the initial 60-day period) for an additional 60 days after the receipt of such request for review. Any decision by the Committee will be furnished to the claimant in writing and will set forth the specific reasons for the decision and the specific Plan provisions on which the decision is based.

(e)   Court Action. No Participant or Surviving Spouse will have the right to seek judicial review of a denial of benefits, or to bring any action in any court to enforce a claim for benefits prior to filing a claim for benefits or exhausting his rights to review under this Section.

Section 7.5   Income and Employment Tax Withholding. The Company will be responsible for withholding from the Participant's compensation or from the distribution of his (or his Surviving Spouse's) benefit under the Plan of all applicable federal, state, city and local taxes.

## ARTICLE VIII
## AMENDMENT AND TERMINATION OF THE PLAN

Section 8.1   Amendment of the Plan. The Company may at any time modify, alter or amend the Plan in whole or in part, but only to the extent agreed to in writing by each Participant affected by the amendment.

Section 8.2   Termination of the Plan. The Company reserves the right at any time to terminate the Plan or to reduce or cease benefit accruals at any time, but only to the extent agreed to in writing by each Participant affected by the termination or reduction.

## ARTICLE IX
## MISCELLANEOUS

Section 9.1   Governing Law. The Plan will be construed, regulated and administered according to the laws of the State of Florida, without reference to that state's choice of law principles, except in those areas preempted by the laws of the United States of America in which case the federal law will control.

7

Section 9.2    Headings and Gender.  The headings and subheadings in the Plan have been inserted for convenience of reference only and will not affect the construction of the provisions hereof.  In any necessary construction the masculine will include the feminine and the singular the plural, and vice versa.

Section 9.3    Participant's Rights; Acquittance.  No Participant will acquire any right to be retained in the Company's employ by virtue of the Plan, nor, upon his dismissal, or upon his voluntary termination of employment, will he have any right or interest in or to any Plan assets other than as specifically provided herein.

Section 9.4    Spendthrift Clause.  No benefit or interest available hereunder will be subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance, attachment or garnishment by creditors of the Participant or the Participant's designated Surviving Spouse, either voluntarily or involuntarily, except to the Company.

Section 9.5    Counterparts.  This Plan may be executed in any number of counterparts, each of which will constitute but one and the same instrument and may be sufficiently evidenced by any one counterpart.

Section 9.6    No Enlargement of Employment Rights.  Nothing contained in the Plan will be construed as a contract of employment between the Company and any person, nor will the Plan be deemed to give any person the right to be retained in the employ of the Company or limit the right of the Company to employ or discharge any person with or without cause, or to discipline any Employee.

Section 9.7    Limitations on Liability.  Notwithstanding any of the preceding provisions of the Plan, neither the Company nor the Committee (or any individual acting as an employee or agent of either of them) will be liable to any Participant, Employee or Surviving Spouse for any claim, loss, liability or expense incurred in connection with the Plan, except when the same will have been judicially determined to be due to the gross negligence or willful misconduct of such person.

Section 9.8    Incapacity of Participant or Surviving Spouse.  If any person entitled to receive a distribution under the Plan is physically or mentally incapable of personally receiving and giving a valid receipt for any payment due (unless prior claim therefor will have been made by a duly qualified guardian or other legal representative), then, unless and until claim therefor will have been made by a duly appointed guardian or other legal representative of such person, the Committee may provide for such payment or any part thereof to be made to any other person or institution then contributing toward or providing for the care and maintenance of such person.  Any such payment will be a payment for the account of such person and a complete discharge of any liability of the Company and the Plan.

Section 9.9    Successors.  The Plan will inure to the benefit of and be enforceable by the Participant's legal representatives.  This Plan will also inure to the benefit of and be binding upon the Company and its successors and assigns.  The Company will require any successor (whether direct or indirect, by purchase, merger, consolidation or otherwise) to all or substantially all of the business and/or assets of the Company to assume expressly and agree to

8

000038

perform this Plan in the same manner and to the same extent that the Company would be required to perform it if no such succession had taken place. As used in this Plan, the term "Company" will mean any successor which assumes and agrees to perform this Plan by operation of law, or otherwise.

Section 9.10   Evidence.  Evidence required of anyone under the Plan may be by certificate, affidavit, document or other information which the person relying thereon considers pertinent and reliable, and signed, made or presented by the proper party or parties.

Section 9.11   Action by Company.  Any action required of or permitted by the Company under the Plan will be by resolution of its Board of Directors or the Committee, or by a person or persons authorized by resolution of the Board or the Committee.

Section 9.12   Severability.  In the event any provisions of the Plan will be held to be illegal or invalid for any reason, such illegality or invalidity will not affect the remaining parts of the Plan, and the Plan will be construed and endorsed as if such illegal or invalid provisions had never been contained in the Plan.

IM-506753_1.DOC

000039

# ADOPTION
## OF
## TALLAHASSEE MEMORIAL HEALTHCARE, INC.
## SUPPLEMENTAL EXECUTIVE RETIREMENT PLAN
(As Amended and Restated Effective as of October 1, 2003)

Pursuant to resolutions adopted by the Board of Directors of Tallahassee Memorial HealthCare, Inc. (the "Company"), the undersigned officers of the Company hereby adopt the Tallahassee Memorial HealthCare, Inc. Supplemental Executive Retirement Plan (As Amended and Restated Effective as of October 1, 2003) on behalf of the Company, in the form attached hereto.

Dated this 21ˢᵗ day of _____April_____, 2004.

TALLAHASSEE MEMORIAL HEALTHCARE, INC.

By: _____

ATTEST: _____

### RESOLUTIONS OF THE
### BOARD OF DIRECTORS OF
### TALLAHASSEE MEMORIAL HEALTHCARE, INC.

WHEREAS, Tallahassee Memorial Healthcare, Inc. (the "Company") maintains the Tallahassee Memorial Healthcare, Inc. Supplemental Executive Retirement Plan (the "Plan"), a "nonqualified" supplemental retirement plan for the benefit of a select group of the Company's management or highly compensated employees; and

WHEREAS, the Company's Board of Directors now deems it desirable to restate the Plan effective as of October 1, 2003;

NOW, THEREFORE, BE IT RESOLVED that the appropriate officers of the Company be, and they hereby are, authorized and directed to adopt the restated Plan on behalf of the Company in substantially the form attached to these resolutions, effective as of October 1, 2003.

FURTHER RESOLVED that the appropriate officers of the Company be, and each hereby is, authorized, for and on behalf of the Company, to take any action those officers deem necessary or desirable to carry out the purpose and intent of this and the foregoing resolution.

\*      \*      \*

I, Michael M. Fields, Secretary of Tallahassee Memorial Healthcare, Inc., hereby certify that the foregoing is a correct copy of resolutions duly adopted by the Board of Directors of that corporation on April 21, 2004, and that the resolutions have not been changed or repealed as of this 21st day of April, 2004.

Michael M. Fields
Secretary, Tallahassee Memorial Healthcare, Inc.

IM-532013_1.DOC

000041

**Attachment No. 3**

Duncan Moore's 2000
Employment Agreement

May-01-2006  02:23pm   From-TMH FINANCE DEPT                    850 431 6498              T-133  P.002/010  F-554

## EMPLOYMENT AGREEMENT

EMPLOYMENT AGREEMENT (the "Agreement"), dated as of the _17TH_ day of October, 2000, between TALLAHASSEE MEMORIAL HEALTHCARE, INC., a Corporation Not For Profit existing under the laws of the state of Florida ("TMH"), and DUNCAN MOORE (the "Employee").

WHEREAS, TMH desires to employ Employee and to assure itself of the continued services of Employee for the term of employment provided for in this Agreement, and the Employee desires to be employed by TMH for such period upon the terms and conditions hereinafter set forth;

NOW, THEREFORE, in consideration of the covenants and agreements hereinafter set forth, the parties hereto agree as follows:

1.    EMPLOYMENT AND DUTIES

1.1    *General.*    TMH hereby employs Employee, and Employee agrees to serve as President and Chief Executive Officer of TMH upon the terms and conditions herein contained. In such capacities, Employee agrees to serve TMH faithfully and to the best of his ability under the direction of the Board of Directors of TMH. Employee also agrees to serve, if elected, at no additional compensation to that provided in this Agreement, as an officer or director of any subsidiary or affiliate of TMH.

1.2    *Term of Employment.*    Employee's employment under this Agreement shall commence on October 17, 2000 (the "Effective Date"), and shall terminate on the earlier of (i) the eighth (8th) anniversary of the Effective Date, or (ii) termination of Employee's employment pursuant to this Agreement (the period commencing on the Effective Date and ending on the eighth anniversary thereof, hereinafter referred to as the "Employment Term");

1.3    *Duties.*    For the Employment Term, Employee agrees to render full-time service to TMH as President and Chief Executive Officer and in connection therewith perform such duties not inconsistent with Employee's position, as Employee may reasonably be directed to perform by the the Board of Directors of TMH. Such duties and responsibilities shall specifically include, but not be limited to:

>    supervision of all activities and related services and programs of TMH;

>    supervision of personnel employed by, or associated with, TMH, its subsidiaries and affiliates;

>    attendance at meetings of the TMH Board of Directors and such committee affiliates thereof as may be appropriate;

1

000043

> preparation of reports concerning operation of TMH, its subsidiaries and affiliates; and,

> such other duties as may be assigned or delegated to Employee by the Board of Directors of TMH.

For purposes of this Agreement, "full-time service" means the rendering of employment services pursuant to the terms of this Agreement each day during regular hours of business, exclusive of vacation, paid sick leave, paid holidays or authorized leave of absences.

2.    *Compensation.*

2.1    *Base Salary.* From the Effective Date, Employee shall be entitled to receive a base salary ("Base Salary") at the rate of $438,000 per annum, payable in arrears, in equal installments not less frequently than monthly in accordance with TMH's payroll practices, with such increases as may be provided in accordance with the terms hereof. Once increased, such higher amount shall constitute the Employee's annual Base Salary. Employee may elect to set aside a portion of his Base Salary as tax deferred income, subject to the requirements of the Internal Revenue Service for 501(c)(3) organizations. TMH will continue to match and pay to the deferred compensation plan an equal amount to that deferred by Employee.

2.2    *Annual Review.* Employee's Base Salary shall be reviewed by the Compensation Committee of the Board of Directors of TMH in good faith based upon Employee's performance, not less than annually, and such Base Salary may be increased (but not decreased upon such review during the remainder of the Employment Term).

2.3    *Base Compensation.* "Base Compensation," as used herein, shall mean the total of: salary and benefits as submitted to the Internal Revenue Service on Form 990 for the component or affiliated organizations of Tallahassee Memorial Healthcare, Inc., e.g., Tallahassee Memorial Healthcare, TMH Foundation, Southeast Community Health Services, Tallahassee Memorial Health Ventures, and any other components or affiliates; and, 2) other salary and benefits received by Employee which are below the threshold amounts required for inclusion on Form 990.

3.    EMPLOYEE BENEFITS.

3.1    *General.* Employee shall be included, to the extent eligible by virtue of his position, tenure, salary, age and other qualifications, in all employee benefit plans, programs or arrangements (including, without limitation, the standard TMH health and malpractice insurance programs and standard TMH pension plan) which shall be established by TMH for or made available to its employees.

3.2    *Liability Insurance.* TMH shall insure Employee under its general and directors and officers' liability insurance policies for acts done in good faith during the Employment Term.

2

3.3    *Automobile.* TMH shall provide to Employee a new automobile every two (2) years. When the automobile reaches two years of age, Employee may purchase same for $1 and TMH will gross up Employee's compensation to cover the income tax expense, if any, associated with such purchase.

3.4    *Medical Exam.* TMH shall provide one free annual medical examination each year for Employee.

3.5    *Reimbursement of Expenses and Dues.*    TMH will reimburse Employee for reasonable travel and other business expense incurred by him in the fulfillment of his duties hereunder. In addition, TMH shall pay or reimburse Employee for: dues of clubs, organizations and professional and service associations as approved, from time to time, by the Chairman of the Board of Directors.

3.6    *Vacation and Leave Time.* Employee shall be entitled to earned time off (ETO) in accordance with TMH's personnel policies for each year of employment. In addition, Employee will be permitted to be absent during working days to attend professional meetings in the United States and to attend to such outside professional duties in the hospital field which have been approved by the Chairman of the Board of Directors or the Executive Committee of the Board of Directors. Attendance at such approved meetings and accomplishment of such approved professional duties shall be fully compensated service time and shall not be considered ETO.

3.7    *Supplemental Executive Retirement Program (SERP).*  TMH has established a Supplemental Executive Retirement Program designed to supplement the retirement benefits of certain key executives. This program is considered a non-qualified benefit plan for the purposes of the Employee Retirement Security Act of 1974 (ERISA). TMH, therefore, agrees to pay the following retirement benefits to Employee upon: a) the expiration of the Employment Term; or b) Employee's termination Without Cause; or c) Employee's resignation with good reason.

Employee's entitlement to and the amount of the retirement benefit, as well as additional terms and conditions relating thereto, are as follows:

a)    Vesting. Employee will be fully vested after ten (10) years of service. (Employee's service commenced on January 29, 1988. The Severance Period, as herein defined, shall be included in the calculation of "service" time in determining whether or not Employee is vested.)

b)    Amount of Benefit.

(1)    After ten (10) years of service, Employee shall be paid an annual benefit (payable monthly) equal to 50% of the average of the highest five (5) years of Employee's Base Compensation;

3

(2)   After fifteen (15) years of service, Employee shall be paid an annual benefit (payable monthly) equal to 65% of the average of the highest five (5) years of Employee's Base Compensation. (For service periods of more than ten (10) but less than fifteen (15) years, the benefit amount shall be prorated at 3% per year, i.e., twelve years of service equals 56%.)

(3)   The SERP benefit payments shall be paid to Employee for his lifetime and, upon the death of Employee, shall be paid to his surviving spouse at a rate equal to 50% of that paid to Employee, for her lifetime; provided, however, that such payments to the surviving spouse shall terminate upon her remarriage after the death of Employee.

(4)   Benefit payments under the SERP shall commence upon the later of Employee's 65th birthday, Employee's termination of service, or the expiration of the Severance Period; provided, however, in the event of termination Without Cause or Employee's death, SERP benefit payments shall commence on such event (termination or death), or Employee's 62nd birthday, whichever is later.

4.   TERMINATION OF EMPLOYMENT.

4.1   *Termination Without Cause; Resignation for Good Reason.*

4.1.1   *General.*   Subject to the provisions of sections 4.1.2 and 4.1.3, if, prior to the expiration of Employment Term, Employee's employment is terminated by TMH without cause, as defined in section 4.3, or if Employee resigns from his employment hereunder for good reason, as defined in section 4.4, TMH shall continue to pay Employee his Base Compensation as of the date of termination or resignation for the lesser of: (i) three years following the date of termination or resignation; or, (ii) the remainder of Employment Term. (Such period, as applicable, is referred to hereinafter as the "Severance Period.") During the Severance Period, Employee shall also be eligible to participate on the same terms and conditions as in effect immediately prior to such termination or resignation, in all health, medical, supplemental medical and life insurance plans or programs provided to Employee by TMH pursuant to section 3 above at the time of such termination or resignation. If, during the Severance Period, Employee is precluded from participating in any of such plans by the terms of such plan or applicable law, TMH shall provide Employee with benefits that are reasonably equivalent in the aggregate to those which Employee would have received under such plan or plans had he been eligible to participate therein. Subsequent to the expiration of the Severance Period, Employee may purchase health insurance at the standard TMH rate until such time as Employee and Employee's spouse reach age 65. (As elsewhere provided herein, the Severance Period shall be included in the calculation of Employee's years of service under the SERP.)

4

000046

4.1.2  *Conditions Applicable to the Severance Period.*  If, during the Severance Period, Employee materially breaches his obligations under section 7 of this Agreement, TMH may, upon written notice to Employee, terminate the Severance Period and cease to make any further payments or provide any further benefits as described in section 4.1.1.

4.1.3  *Death During Severance Period.*  In the event of Employee's death during the Severance Period, TMH shall continue to make all payments (otherwise payable to Employee) for the remainder of the Severance Period to the beneficiary designated by Employee. Unless otherwise designated in writing by Employee, such beneficiary shall be the surviving spouse of Employee.

4.1.4  *Date of Termination.*  The date of termination of employment Without Cause shall be the date specified in a written notice of termination to Employee. The date of resignation for Good Reason shall be the date specified in the written notice of resignation from the Employee to TMH.

4.2    *Termination for Cause; Resignation Without Good Reason.*

4.2.1  *General.*  If, prior to the expiration of the Employment Term, Employee's employment is terminated by TMH for "Cause," as herein defined, or if Employee resigns from his employment hereunder other than for "Good Reason," as herein defined, Employee shall be entitled only to payment of his Base Salary earned through and including the date of termination or resignation. Employee shall have no further right to receive any compensation or to participate in any other plan, arrangement or benefit after such termination or resignation of employment.

4.2.2  *Date of Termination.*  The date of termination for Cause shall be the date of receipt by Employee of a written notice of termination provided for in section 4.2.3. The date of resignation without Good Reason shall be the date specified in the written notice of resignation from Employee to TMH, or if no date is specified therein, ten (10) business days after receipt by TMH of written notice of resignation from Employee.

4.2.3  *Notice of Termination.*  Termination of Employee's employment for Cause shall be communicated by delivery to Employee of a written notice from TMH, stating that, in the good faith opinion of TMH, an event constituting for Cause termination in accordance with section 4.3 has occurred and specifying the particulars thereof (a "Notice of Termination"). For purposes of this Agreement, no purported termination of Employee's employment for Cause shall be effective without delivery of such notice of termination. At Employee's request, Employee shall be entitled to appear before the Board of Directors of TMH, and if he so chooses, request that the Board reconsider its determination.

4.3    *Cause.*  Termination for "Cause" shall mean termination of Employee's employment because of Employee's: (i) conviction of, or guilty pleas to, a felony or a crime involving moral turpitude, (ii) gross or flagrant inattention to, or execution of, duties continuing for more than sixty (60) days after the Board of Directors provides written notice to Employee that he is subject to

5

termination for Cause based upon continuation of the activities as described in the notice; or (iii) material breach of any provision of the Agreement. The determination of "Cause," for the purpose of this section, shall be narrowly construed in favor of Employee so that Employee is protected financially from termination as a result of unpopular decisions or actions taken by Employee in good faith in the discharge of Employee's duties, which actions were later determined to be unpopular, ill-advised or politically unacceptable. Any determination to terminate Employee's employment for Cause shall be effective only when taken by a majority vote of all members of the Board of Directors.

4.4     *Good Reason.*    For the purpose of this Agreement, "Good Reason" shall mean termination of employment by Employee for reason of TMH's material breach of any provision of the Agreement, or a change of control of TMH through merger, acquisition or other alliance, or the transfer of substantially all of the assets of TMH to another entity not wholly-owned or controlled by TMH, or a significant change in the nature and scope of Employee's duties from those applicable immediately prior to the date on which a change of control occurs.

5.     DEATH OR PERMANENT DISABILITY.

5.1     *Death.*    If Employee's employment hereunder is terminated by death prior to Employee's 65th birthday, TMH shall continue to pay Employee's spouse, or other designated beneficiary if there is no surviving spouse, an amount equal to the Base Salary in effect as of the date of death for the lesser of: the remainder of the Employment Term, or Employee's 62nd birthday.

5.2     *Permanent Disability.*    In the event Employee shall become physically or mentally disabled so that he is unable to render the services provided for by this Agreement for a period of six (6) consecutive months, or for shorter periods aggregating six (6) months during any twelve-month period, TMH may at any time after the last day of the sixth consecutive month of disability or the day on which the shorter periods of disability equal an aggregate of six (6) months, terminate the Employment Term for permanent disability by written notice to Employee. TMH shall, following such termination, pay an amount equal to 60% of Employee's Base Compensation as then in effect for the remainder of the Employment Term and shall continue during such period Employee's participation in medical benefit programs then maintained for TMH employees (or shall provide reasonable equivalent benefits). Employee will use his reasonable best efforts to cooperate with any physician engaged by TMH to determine whether or not permanent disability exists, and the determination of such physician made in writing to TMH and Employee shall be final and conclusive for all purposes of this Agreement. Any payments provided for in section 5.2 shall be offset (but not below zero) by any salary continuation payments or SERP benefit payments received by Employee under any plan, program or arrangements in which Employee participated pursuant to section 3 of this Employment Agreement.

6

6.    NON-COMPETITION.

Upon termination of employment for any reason, Employee will not for a period of one (1) year from the date of termination engage in, accept employment from or become affiliated or connected with, directly or indirectly, or be interested, directly or indirectly, in any way with any competitor of TMH within the County of Leon, State of Florida. The parties specifically agree that TMH shall have the right to enforce the provisions of this section through injunctive relief in addition to and not as substitution for other remedies or damages that may be available to TMH. This non-competition provision shall survive termination or expiration of this Employment Agreement.

7.    MISCELLANEOUS.

7.1    *Notices.*   All notices or communications hereunder shall be in writing addressed as follows:

TMH:        Chairman, Board of Directors
            Tallahassee Memorial Hospital
            Magnolia & Miccosukee Roads
            Tallahassee, Florida 32308

Employee:   Duncan Moore
            2179 Miller Landing Road
            Tallahassee, FL 32312

Any such notice or communication shall be delivered in person, by cable, by telecopy (with confirmation copy of such telecopied material delivered in person or by registered or certified mail, return receipt requested) or by certified or registered mail, return receipt requested, addressed as above (or to such other address as such party may designate in writing from time to time), and the actual date of receipt, as shown by the receipt therefor, shall determine the time at which notice was given.

7.2    *Severability.*   If a court of competent jurisdiction determines that any term or provision hereof is invalid or unenforceable, (a) the remaining terms and provisions hereof shall be unimpaired and (b) such court shall have the authority to replace such invalid or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision.

7.3    *Entire Agreement.*   This Agreement represents the entire agreement of the parties and shall supersede any and all previous contracts, arrangements or understandings between TMH and Employee. The agreement may be amended at any time by mutual written agreement of the parties hereto.

7

7.4   *Withholding.*   TMH shall be entitled to withhold, or cause to be withheld, from payment of any amount of withholding taxes required by law with respect to payments made to Employee in connection with his employment hereunder.

7.5   *Governing Law.*   This Agreement shall be construed, interpreted and governed in accordance with the laws of Florida without reference to rules relating to conflict of law.

7.6   *Successors.*   This Agreement shall be binding upon and inure to the benefit of, and shall be enforceable by Employee and TMH, their respective heirs, executors, administrators and assigns. In the event TMH is merged, consolidated, liquidated by a parent corporation, or otherwise combined into one or more corporations, the provisions of this Agreement shall be binding upon and inure to the benefit of the parent corporation or the corporation resulting from such merger or to which the asset shall be sold or transferred, which corporation from and after the date of such merger, consolidation, sale or transfer shall be deemed to be TMH for purposes of this Agreement. In the event of any other assignment of this Agreement by TMH, by operation of law or otherwise, TMH shall remain primarily liable for its obligations hereunder. This Agreement shall not be assignable by Employee.

7.7   *Headings.*   The headings of sections herein are included solely for convenience of reference and shall not control the meaning or interpretation of any of the provisions of this Agreement.

7.8   *Counterparts.*   This Agreement may be executed by either of the parties hereto in counterparts, each of which shall be deemed to be an original, but all such counterparts shall, together, constitute one and the same instrument.

7.9   *Authority.*   TMH represents and warrants that the signatory party hereto on behalf of TMH is a duly appointed officer of TMH acting pursuant to the power and authority granted to such officer by the Board of Directors of TMH. TMH further represents that the execution of this Agreement on behalf of TMH by a single signatory party with such power and authority shall be deemed binding upon TMH.

7.10   *Attorney's Fees.*   The prevailing party in any litigation arising out of this Agreement shall be entitled to reasonable attorney's fees and costs, through and including any appeal, from the other party.