May-01-2006  02:25pm   From-TMH FINANCE DEPT                    850 431 6498          T-133   P.010/019   F-554

IN WITNESS WHEREOF, TMH has caused this Agreement to be duly executed, and Employee has hereunto set his hand and seal, as of the day and year first above written.

TALLAHASSEE MEMORIAL HEALTHCARE, INC.
A Corporation Not For Profit

By: _____
Chuck Mitchell, Chairman

_____
DUNCAN MOORE

9

## Attachment No. 4

Duncan Moore's Employment
Agreement dated 1/29/88

000052

## EMPLOYMENT AGREEMENT

THIS AGREEMENT made as of the 29 day of *January*, 1988, between the Board of Directors of Tallahassee Memorial Regional Medical Center, Inc., hereinafter referred to as "Medical Center" and Duncan Moore, of Albany, Georgia, hereinafter referred to as "Moore."

WHEREAS, the Medical Center desires to employ Moore as ADM/CEO of Tallahassee Memorial Hospital d/b/a Tallahassee Memorial Regional Medical Center, and Moore hereby accepts the employment.

NOW, THEREFORE, in consideration of the mutual promises, the parties agree as follows:

1. **Purposes.** Moore shall render full time professional services to the Medical Center in the capacity as stated above for Tallahassee Memorial Hospital (TMH) acute care hospital. He will at all times, faithfully, industrially, and to the best of his ability, perform all duties that may be required of him by virtue of his position and all duties set forth in the Medical Center's ByLaws to the reasonable satisfaction of the Board of Directors. His duties shall specifically include the supervision of the acute care hospital (TMH); the supervision of personnel; financial matters; attendance at meetings of the Board of Directors and its Executive Committee; reports to both bodies concerning all phases of the operation of the acute care hospital (TMH), including, as well as all services rendered in connection with the operation of the acute care hospital (TMH), employment of personnel, and acquisition of machinery and equipment. In addition, Moore shall perform in the same manner any special duties assigned or delegated to him by the Executive Committee or the Board of Directors.

PAGE ONE OF SIX PAGES

2.   _Compensation_.   In consideration for these services as stated above, the Medical Center shall pay to Moore an amount mutually agreed upon at an annual review of his compensation by the Executive Committee of the Board:  Said amount not in any event to be less than the previous year's salary.  Moore may, at his option, request and require that such portion of his salary as he may designate be set aside as tax deferred income subject to the requirements of the Internal Revenue Service (IRS) as are permitted for a 501(c)(3) organization.

3.   _Benefits_.   The Medical Center shall purchase or make available the following benefits to Moore:

A.   _Life Insurance_.  The Medical Center shall purchase a $1,000,000 term life insurance policy on the life of Moore at standard rates.

B.   _Health Insurance_.  Moore shall be entitled to such health insurance as provided to other employees of the Medical Center.

C.   _General Liability Insurance_.  The Medical Center shall insure Moore under its general liability insurance policy for all acts done in good faith during the term of this Agreement.

D.   _Retirement Benefits_.  Moore shall be entitled to the same retirement benefits offered to other employees of the Medical Center.

E.   _Automobile_.  The Medical Center shall purchase or lease for Moore every three (3) years a new automobile.  In the event that the Internal Revenue Service (IRS) changes its rules concerning automobiles, then an adjustment shall be made in Moore's compensation for such changes to offset additional expense to Moore.

F.   _Disability Insurance Policy_.  The Medical Center shall purchase a standard disability policy which shall cover

PAGE TWO OF SIX PAGES

000054

sixty percent (60%) of the base pay of Moore in the event that Moore becomes disabled.

G. Medical Examination. The Medical Center shall provide one (1) free annual medical examination per year for Moore.

H. Dues. The Medical Center shall pay dues to professional associations and societies and to such service organizations and clubs of which Moore may become a member as approved by the Chairman of the Board or the Executive Committee of the Board of Directors as being in the best interest of the Medical Center.

4. Vacation And Leave Time. Moore shall be entitled to earn time off (ETO) in accordance with the Medical Center's personnel policies for each year of employment. In addition, Moore will be permitted to be absent from the acute care hospital (TMH) during working days to attend professional meetings in the United States and to attend such outside professional duties in the hospital field which have been mutually agreed upon between Moore and the Chairman of the Board of Directors or the Executive Committee of the Board of Directors. Attendance at such approved meetings and accomplishment of approved professional duties shall be fully compensated service time and shall not be considered ETO. The Medical Center shall reimburse Moore for all expenses incurred by him incident to attendance at approved professional meetings.

5. Termination. Should the Medical Center terminate Moore without cause, then the Medical Center shall pay to Moore a year's salary and if termination occurs subsequent to the first year's employment, Moore shall be entitled to a year's salary plus an additional month's salary for each year of employment that Moore has accumulated.

000055

A. Termination For Cause. If Moore is terminated for cause by the Medical Center, then there shall be no payment to Moore. Cause is hereby defined as being charged with a serious crime, the wilfull neglect of his duties of employment at the acute care hospital (TMH), habitual absence, and/or gross and flagrant inattention to duties. The Board shall notify Moore in writing of termination for cause by registered mail and termination shall be effective as of the date of receipt by Moore.

B. Termination By Moore. If Moore decides to terminate this Employment Agreement, then he shall give six (6) months' written notice to the Board of Directors by registered mail.

C. Competition. Upon termination of this Agreement for any reason for a period of one (1) year following the effective date of this termination, Moore shall not be employed by or work in any capacity for any health care facility in the Tallahassee area without first obtaining the written authorization of the Chairman of the Board of Directors of the Medical Center. The Tallahassee area is hereby defined as Leon, Jefferson, Taylor and Gadsden Counties, Florida, and Thomas County, Georgia. In the event of a breach of this restrictive covenant, the Medical Center shall be entitled to injunctive relief, it being agreed by the parties that there would be no adequate remedy at law available to the Medical Center.

D. Involuntary Termination Due To Death Or Disability. In the event of the death of Moore, this Agreement shall terminate and in the event of a long term disability, herein defined as six (6) months, then this Agreement shall be terminated. This Agreement shall be terminated by the Medical Center if it loses its state license or there is a destruction or closing of the Medical Center.

6. Review Of Performance Annually. The Board of Directors shall annually do a performance review which shall include a

PAGE FOUR OF SIX PAGES

000056

comprehensive assessment of achievements on the job, measured by the standards criteria and guidelines developed by the Board of Directors. This review process shall include the setting of new goals, standards, and objectives for the future.

7.   Term Of Agreement.   This Agreement shall be for an indefinite term unless terminated as provided herein.

8.   Amendments To Agreement.   The terms and conditions of this Agreement may be amended at any time by written agreement of the parties signed by the Chairman of the Board and Moore.

9.   Entire Agreement.   This Agreement constitutes the entire agreement between the parties.   It supersedes any and all other agreements or contracts, either oral or written, between the parties with respect to the subject matter hereof.

10.   Invalidity.   The invalidity or unenforceability of any particular provision of this Agreement shall not affect other provisions and this Agreement shall be construed in all respects as if such invalid or unenforceable provision had been omitted.

11.   Assignment.   Neither party shall assign this Agreement without the written consent of the other party.

12.   Attorneys' Fees And Costs.   In the event that either party to the Agreement breaches the Agreement, then the prevailing party shall be entitled to attorneys' fees and court costs.

13.   Laws Of The State Of Florida.   This Agreement shall be construed and enforced under and in accordance with the laws of the State of Florida.

TALLAHASSEE MEMORIAL REGIONAL
MEDICAL CENTER, INC.

BY _____
Chairman Of The Board

PAGE FIVE OF SIX PAGES

*Anita M. Hudgens*

*Helen L. Shope*

DUNCAN MOORE

PAGE SIX OF SIX PAGES

000058

**Attachment No. 5**

Comprehensive Schedule of Duncan Moore's
compensation and various possible computations of the SERP benefit

000060

Duncan Moore - Calculation of Base Compensation and Total Target Benefit

**Step 1: Calculate 5 year totals of component items:**

| | Base comp Period | Base compensation Calculation | Base | Deferred Match | Benefits w/o PL/LTS payout | Benefits w/ PL/LTS payout |
|---|---|---|---|---|---|---|
| Year 1 | 6/30/03-7/1/02 | | 438,000 | 125,000 | 65,701 | 255,439.00 |
| Year 2 | 6/30/02-7/1/01 | | 438,000 | 125,000 | 20,062 | 20,062.00 |
| Year 3 | 6/30/01-10/17/00 10/16/00-10/9/00 10/8/00-7/1/00 | (438,000/12) x 8 1/2   310,250 (432,254/12) x 1/2   18,011 (420,254/12) x 3   105,066 | | | | |
| Year 3 Total | | | 433,327 | 112,500 | 21,888 | 21,888.00 |
| Year 4 | 6/30/00-10/11/99 10/10/99-7/1/99 | (420,264/12) x 8 1/2   297,687 (400,248/12) x 3 1/2   116,739 | | | | |
| Year 4 Total | | | 414,426 | 100,000 | 29,193 | 29,193.00 |
| Year 5 | 6/30/99-7/1/98 | | 400,248 | 100,000 | 36,896 | 36,896.00 |
| 5 year totals | | | 2,124,001 | 562,500 | 173,740 | 363,478 |

**Step 2: Calculate average annual amounts by scenario**

| | Scenario 1 Base comp only | Scenario 2 Base + Deferred match | Scenario 3 Base + benefits (w/o PL/LTS) | Scenario 4 Base + deferred + benefits (w/o PL/LTS) | Scenario 5 Base + deferred + benefits (w/ PL/LTS) |
|---|---|---|---|---|---|
| Base compensation | 2,124,001 | 2,124,001 | 2,124,001 | 2,124,001 | 2,124,001 |
| Deferred match | | 562,500 | | 562,500 | 562,500 |
| Benefits (w/o PL/LTS pay out) | | | 173,740 | 173,740 | |
| Benefits (w/ PL/LTS pay out) | | | | | 363,478 |
| 5 year total | 2,124,001 | 2,686,501 | 2,297,741 | 2,860,241 | 3,049,979 |
| 5 year average | 424,800 | 537,300 | 459,548 | 572,048 | 609,996 |
| target percentage | 65% | 65% | 65% | 65% | 65% |
| Target benefit, before offsets | 276,120 | 349,245 | 298,706 | 371,831 | 396,497 |
| *Offset amounts:* | | | | | |
| TMH defined benefit pension (payment started 7/1/2003) | 33,597 | 33,597 | 33,597 | 33,597 | 33,597 |
| Social security (estimated @ www.ssa.gov assuming 6-23-2006 start) | 23,124 | 23,124 | 23,124 | 23,124 | 23,124 |
| Total offset amounts | 56,721 | 56,721 | 56,721 | 56,721 | 56,721 |
| Net payment amount (Target benefit minus offsets) | 219,400 | 292,525 | 241,985 | 315,111 | 339,777 |

Base compensation: amount identified as compensation in employment contract or memorandum from Board chair
Deferred match:  amount contributed by TMH to deferred compensation account as match for Moore contributions
Benefits:  value of benefits included in form W-2 as taxable additions to income
PL/LTS:  amount of accrued, unused personal leave time and long term sick that was paid to Moore at separation from service

Duncan Moore
Compensation details

source file: Moore recap of W-2 1988-2005 and 990 recon.xls

| | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | W-2C 2004 | 2005 | 1/1/2006 to 3/31/2006 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Wages, Personal leave time Sick time paid | 393,957.23 | 414,738.93 | 433,551.17 | 443,295.19 | 442,448.92 | 226,108.16 | | | | 4,616,465.86 |
| Deferred comp match - TMH 100% | 100,000.00 | 100,000.00 | 99,999.90 | 124,999.94 | 124,999.94 | 68,359.97 | | | | 916,599.75 |
| Payment of accrued, unused personal leave and sick time | | | | | | 189,737.58 | | | | 189,737.58 |
| Severance paid | | | | | | 226,806.80 | 591,893.82 | 539,265.22 | 124,445.82 | 1,427,965.84 |
| Severance, present value | | | | | | | 2,103,161.05 | | | 2,103,161.05 |
| SERP present value | | | | | | | 4,146,814.12 | | | 4,146,814.12 |
| NQ deferred comp payment (Wells Fargo) | | | | | | | | | | |
| **Subtotal** | 493,957.23 | 514,738.93 | 533,551.07 | 568,295.13 | 567,448.86 | 781,052.51 | 6,841,868.99 | 539,265.22 | 124,445.82 | 13,400,744.20 |
| **Benefits** | | | | | | | | | | |
| Personal auto allowance | 3,100.00 | 3,195.00 | 3,500.00 | 3,500.00 | 3,100.00 | 3,875.00 | | | | 47,497.00 |
| Fuel charged to TMH 100% | 2,743.18 | 2,190.13 | 2,988.12 | 3,071.51 | 2,353.73 | 1,735.76 | | | | 34,932.76 |
| Disability insurance premium | 10,370.80 | 10,370.80 | 10,370.80 | 10,370.80 | 7,778.10 | 5,185.40 | | | | 132,067.21 |
| Life insurance premium | | | | | | | | | | 373,635.60 |
| Dues, fees non-business | 5,084.39 | 4,519.19 | 4,476.89 | 5,518.13 | 4,431.46 | 5,756.69 | | | | 57,294.39 |
| Moving allowance | | | | | | | | | | 15,000.00 |
| FMV 1995 Jeep Cherokee | 15,424.00 | | | | | | | | | 15,424.00 |
| FMV 1998 Chevy Blazer | | 16,695.00 | | | | | | | | 16,695.00 |
| FMV 1999 Dodge Durango | | | | | | 15,379.48 | | | | 15,379.48 |
| FMV 2001 Jeep Cherokee | | | | | | 24,937.44 | | | | 24,937.44 |
| **Subtotal - benefits** | 36,722.35 | 37,070.12 | 21,315.51 | 22,460.44 | 17,663.29 | 56,869.77 | | | | 732,862.88 |
| **Total Compensation** | 530,679.58 | 551,809.05 | 554,866.88 | 590,755.57 | 585,112.15 | 837,922.28 | 6,841,868.99 | 539,265.22 | 124,445.82 | 14,133,607.08 |

**Allocation of benefits by SERP year:**

Benefits, w/o PLT/LTS payout:

| | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | Total by year rounded |
|---|---|---|---|---|---|---|---|
| Year 1: 7/1/2002 - 6/30/2003 | | | | | 8,831.65 | 56,869.77 | 65,701.00 |
| Year 2: 7/1/2001 - 6/30/2002 | | | | 11,230.22 | 8,831.65 | | 20,062.00 |
| Year 3: 7/1/2000 - 6/30/2001 | | | 10,657.91 | 11,230.22 | | | 21,888.00 |
| Year 4: 7/1/1999 - 6/30/2000 | | 18,535.06 | 10,657.91 | | | | 29,193.00 |
| Year 5: 7/1/1998 - 6/30/1999 | 18,361.18 | 18,535.06 | | | | | 36,896.00 |
| | | | | | | | 173,740.00 |

Benefits, w/ PLT/LTS payout:

| | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | |
|---|---|---|---|---|---|---|---|
| Year 1: 7/1/2002 - 6/30/2003 | | | | | 8,831.65 | 246,607.35 | 255,439.00 |
| Year 2: 7/1/2001 - 6/30/2002 | | | | 11,230.22 | 8,831.65 | | 20,062.00 |
| Year 3: 7/1/2000 - 6/30/2001 | | | 10,657.91 | 11,230.22 | | | 21,888.00 |
| Year 4: 7/1/1999 - 6/30/2000 | | 18,535.06 | 10,657.91 | | | | 29,193.00 |
| Year 5: 7/1/1998 - 6/30/1999 | 18,361.18 | 18,535.06 | | | | | 36,896.00 |
| | | | | | | | 363,476.00 |

000061

Moore, Duncan

## 1. Base Compensation

### Effective date

| | |
|---|---|
| 10/17/2000 | 438,000.00 |
| 10/9/2000 | 432,264.00 |
| 10/11/1999 | 420,264.00 |
| 7/1/1998 | 400,248.00 |
| 8/1/1997 | 367,200.00 |

## 2. Deferred compensation match

### CYE

| | |
|---|---|
| 12/31/2003 | 125,000.00 |
| 12/31/2002 | 125,000.00 |
| 12/31/2001 | 125,000.00 |
| 12/31/2000 | 100,000.00 |
| 12/31/1999 | 100,000.00 |
| 12/31/1998 | 100,000.00 |

## Attachment No. 6

Letter dated 9/11/03 from Mr. Flood
to Mark O'Bryant, wherein Mr.
Flood transmits copies of relevant
documents from his file

000063

September 11, 2003

Mr. Mark O'Bryant
President and Chief Executive Officer
Tallahassee Memorial Healthcare
1300 Miccosukee Road
Tallahassee, Florida  32308-5093

Dear Mark:

Yesterday, Gail Seals requested that I send any information that I had on Executive Salary and Retirement Plans, particularly as it related to Duncan Moore, from the project that I completed for Tallahassee Memorial Healthcare in 1998.  She indicated that she had seen some information that referenced letters that I had written to Dr. John Lewis, dated May 18 and September 4, 1998.  Dr. Lewis was Chairman of the Board at that time.  I not only found these letters, but a number of other letters and information that I thought might be pertinent.

Rather than clean copies, I am sending you copies with my personal notes on them.   You may find some of the notes interesting.   The letters include correspondence addressed to Duncan, as I always wanted Duncan to be fully informed of anything that I was getting ready to send to the Board.  As a matter of practice, I never talk about a subject or send information to Board members without first reviewing the information with CEO's and obtaining their comments.

Rather than sending you all of the letters and having you try to discern the purpose of each one, below I will try to outline the basic objective of each batch of letters that are enclosed

Letter A – March 19, 1998

This initial letter summarizes the TMRMC Employee Retirement Program and then outlines a number of hospitals' response to TEFRA regulations.   The letter also describes hospital Supplemental Executive Retirement Plans (SERP's) for the Board members and proposes a course of action.

Mr. Mark O'Bryant
September 11, 2003
Page Two

## Letter B – May 18, 1998

This letter is a finalized version of the March 19, 1998, letter that I used in an actual meeting with Dr. Lewis and several other Board members who were on the Compensation Committee.  The personal notes on this letter reflect the points that I emphasized during the meeting; note on the bottom of page 5, the three recommendations that were approved at the end of the meeting. Also, note on the top of Page 6 that the Committee agreed that I should look at Duncan's existing contract.

## Letter C and Attachments – July 31, 1998

This letter and attachments describe my comments on Duncan's existing (at the time) employment agreement with TMRMC.   I went through each paragraph in the original contract and made various comments and recommendations. At about the same time that I reviewed Duncan's contract, I did an evaluation of his then existing Supplemental Executive Retirement Plan (SERP). This is shown on C-1.  The last table outlines the SERP annual investment requirements based upon the retirement targets approved in the May 18th meeting (see Letter B, bottom of page 5).  Note on Page C-2 that the annual investment per year was projected to be $921,000, without Dr. McDonald being included, and almost $1.9 million if he were included.

## Letter D – June 12, 1998

This is a cover letter to Duncan for his review of a proposed letter to Dr Lewis that compared CEO Total Direct Compensation with national CEO compensation at the mean, 75% percentile, and maximum.  The handwritten changes are Duncan's.  This letter was finalized and discussed with Dr. Lewis. However, I could not find the final copy; therefore, I have sent you this preliminary copy.

## Letter E and Attachments – September 4, 1998

This letter outlines an analysis of the SERP funding requirements and options.  Note on page 3 of this letter that all of the recommendations outlined were approved in the September 4th meeting.  Also, note the last sentence on page 4 that I had several thoughts for the committee members to consider regarding Duncan's contract.  These are covered in Attachment A.

Mr. Mark O'Bryant
September 11, 2003
Page Three

Letter F – September 23, 1998

This letter was a follow up to the September 4th Board Compensation
Committee meeting.  The attachments include Duncan's original employment
agreement and a proposed employment agreement based upon our
discussions with the Compensation Committee and my proposed
recommended changes to the agreement.

Letter G – October 14, 1998

This is a cover letter from Duncan to me sending a copy of Gail Seals' cover
letter to the Officers of the Board regarding Duncan's original contract and the
proposed changes for a new one.  A number of the proposed changes were
developed from the September 23rd recommendations

Letter H – October 19, 1998

This letter was developed based upon the information in Letter G and its
attachments, and from a direct conversation with Dr. Lewis.  This letter more
fully describes the severance period and 'Termination for Cause' definition.  It
also mentions 'Constructive Termination'.  Note on the bottom of page 2, my
handwritten notes concerning the Committee's conclusions and
recommendations that were approved.

Mark, from all of the above, a final contract was drafted by the Committee for
Duncan.  Since there was not another scheduled meeting for me to attend, I
never received a final copy of Duncan's signed contract.  Therefore, I do not
have one to send to you in this packet.  I hope the enclosed information is
helpful.  If you have any further comments or questions, please let me know.

Warm personal regards,

Paul M. Flood, C.M.C., C.H.C.
Chairman

enclosures

PMF/ms

000066



May 21, 2004


Mr. Duncan Moore
2179 Miller Landing Road
Tallahassee, Florida 32312

Dear Duncan:

Enclosed are the letters and reports that we discussed in Sandestin on Wednesday, May 5th. The enclosures are from 'A' to 'H'. I hope these are helpful. If you have any additional questions or comments, do not hesitate to call me at 770-844-7574. Good Luck!

Warm personal regards,

Paul M. Flood, C.M.C., C.H.C.
Chairman

PMF/ms

enclosures



## Chattahoochee Health Resources

March 19, 1998

Mr. Duncan Moore
President & CEO
Tallahassee Memorial Regional Medical Center
1300 Miccosukee Road
Tallahassee, FL  32308-5093

Dear Duncan,

Enclosed a "preliminary" copy of a letter to you that when finalized should be copied to your Board Chairman.  Please review it carefully and make appropriate changes.  There are some numbers that are incorrect.  For example, the second paragraph on page two discusses the average employee working 22 years and retires at an average of $45,000.  Please have someone determine what the correct numbers are. On page one, I may be slightly off on you being 62 years of age after 15 years with the hospital.  The CFO's annual earnings may also be off slightly.  (You indicated that he made between $230,000 and $240,000 per year.)

We can probably review the letter on the telephone, or if you prefer, I can make another visit.  Once we have finalized the letter to your satisfaction, we should probably have a meeting with your Board Chairman to review the contents in detail and develop a plan for presenting the ideas contained in the letter to the Executive Committee of the Board.  As we discussed in our last meeting, it is very important to have his full support.  It may be even preferable for him to make the presentation, with you and I available to answer questions.  We can determine this when we meet with him or sooner.

I estimate that it will require three visits to obtain approval of the SERP plan from the Executive Committee.  These include our first visit, meeting with the Chairman, and the presentation to the Executive Committee.  Based upon these meetings and the time required to prepare for them, I estimate that consulting fees will be from $15,000 to $18,000.  Report preparation and travel expenses are additional and invoiced at cost.  They generally run 10-15% of fees.  When the Executive Committee approves our recommendations, it may be desirable for me to coordinate with Valic or whoever handles the implementation/actuarial part of the SERP plan.  I can estimate the time required and fees for the implementation portion of the study at that time.

I look forward to working with you on such an important project.  I will call you after you have had an opportunity to review this letter.

Warm personal regards,

Paul M. Flood, C.M.C., A.A.H.C.
Chairman
Chattahoochee Health Resources

000068

# Chattahoochee Health Resources

March 19, 1998

Mr. Duncan Moore
President & CEO
Tallahassee Memorial Regional Medical Center
1300 Miccosukee Road
Tallahassee, FL 32308-5093

Dear Duncan,

It was a pleasure to meet with you and visit TMRMC in February. You asked that I represent the Medical Center's Board of Directors in evaluating your Employee Pension Plan and its impact on senior management deferred compensation.



## A.     TMRMC EMPLOYEE RETIREMENT PROGRAM

As we discussed, you and the senior management participate in TMRMC's regular employee retirement program. This program is designed to pay employees 1.5% per year (of the employee's last three years average salary up to $150,000) times the number of years employed at TMRMC. For example, if a nurse or therapist averaged $50,000 their last three years of employment and worked for 15 years, their retirement income would be:

1.5% x 15 years x $50,000 + Social Security ($20,000 estimate) = $11,250 + $20,000 = $31,250 or 62.5% of salary.

If an upper middle manager worked 25 years and earned $100,000 average the last three years, his/her retirement would be:

1.5% x 25 years x $100,000 + Social Security = $37,500 + $20,000 = $57,500 or 57.5% of direct compensation.

On the other hand, if you as CEO retired after 15 years (you would be approximately 62), your TMRMC retirement program based upon your current compensation would be:

1.5% x 15 years x $150,000 (plan maximum) + Social Security = $33,750 + $20,000 = $53,750 or 11.7% of direct compensation.

If you stayed until you are 65 years old (18 years), assuming current compensation level, your retirement income would be $60,500 or

13.2% of direct compensation.

Another example would be your Chief Financial Officer, who earns approximately $235,000 per year. Assume he retires with 25 years of service with TMRMC. His retirement income would be:

1.5% x 25 years x $150,000 + Social Security = $56,250 + $20,000 = $76,250 or 32.4% of direct compensation.

1

000069

As you can see, the TMRMC pension plan works quite well for the rank and file employees. However, once an executive or senior manager earns over $150,000 per year, retirement income as a percentage of salary or direct compensation drops significantly.

Today the average employee retiring has worked at TMRMC 22 years and has earned approximately $45,000 average over the last three years. He/she therefore retires with an average retirement pay of $34,850 per year or 77% of final annual salary. (1.5% x 22 years x $45,000 + $20,000 social security.)

Since the Tax Reform Act of 1986, both hospitals as well as public and private companies have faced the dilemma of how to equalize their retirement programs so that key executives maintain a similar standard of living in retirement as they did while working, by receiving a percentage of their final annual salary that is comparable with the percentage of salary that regular employees receive.

As at TMRMC most employer sponsored retirement plans qualify for federal tax advantages. However, these plans have strict limits on how much employees and employers can invest in pension and 401(K) funds. While rank-and-file employees are generally unaffected by such limits, the TEFRA Act places a $150,000 limit on "highly paid" executives.

As indicated in the previous examples, the TMRMC funded pension plan will provide most employees with a significant percentage of their salary after retirement, particularly when one adds social security benefits. Retired executives, however, will receive a much lower percentage of their final salary because of the federal caps on employer contributions and payouts.

Although I have not analyzed individual benefits of those who have retired recently, it appears the objective of the TMRMC pension plan is for employees to retire with a target between 60% and 70% of final pay. It stands to reason that executives should have a similar or higher retirement target as rank-and-file employees.

## B.    HOSPITALS RESPONSE TO TEFRA

Since the TEFRA caps were put in place, there has been a steady erosion in what hospitals and private companies can provide for executives through a qualified employee pension plan. In response, many hospitals and companies have fashioned "non qualified" executive plans outside traditional retirement plan boundaries, which are subject to less Internal Revenue Service regulations and try to match or exceed the salary to benefit ratio of other employees. In reality, this is giving back to executives something that they already had before the federal caps.

72% of the respondents in a 1997 William M. Mercer survey reported that their commitment to a non qualified executive retirement plan - one that doesn't qualify for traditional tax advantages - was driven by a tax code that discriminates against high salaried employees. Their wide spread popularity in healthcare, as well as the private sector, is also a testament to the premium that most board of directors place on assembling a cadre of quality executives. Many board members have made the comment, "To get a good management team and retain it," is the real prize for an effective supplemental executive retirement program (SERP).

Every year I do a survey in Georgia of hospitals and health systems that have in excess of 250 operating beds in the main hospital. Of these twenty (20) hospitals, eighteen (18) have some form of a supplemental executive retirement program. Thirteen (13) have defined benefit plans and five (5) had significant defined

2

contribution plans. The defined benefit plans have the following targets as a percentage of final compensation.

| 50% | 55% | 60% | 65% | 70% | Total |
|-----|-----|-----|-----|-----|-------|
| 2 | 2 | 2 | 3 | 3 | 13 |

Three (3) hospitals have defined contribution plans with targets ranging from $1.25 million to $2.5 million at retirement. Three (3) others have various types of defined contribution plans. Of the two (2) hospitals that have only employee pension plans, one is in the process of implementing a defined benefit plan with a target of 65% of direct compensation for the CEO.

Two recent surveys by KPMG Peat Marwick and Arthur Anderson indicated that 90% of the Fortune 1000 companies offer executives some degree of supplemental benefits beyond the standard menu of retirement options. Towers Perrin also conducted an informal survey of supplemental, non qualified retirement plans and deferred compensation arrangements for 51 non-profit hospital and health systems. Their study indicated the following:

1.  Number of Executives Covered
    One (CEO)                                        34%
    Two to Five                                      22%
    Six to Ten                                       20%
    More than Ten                                    24%

2.  Plan Structure
    Supplemental Defined Benefit or Target Benefit   78%
    Supplemental Defined Contribution                10%
    Deferred Compensation                            12%

3.  Defined Benefit Target
    Target
    50%                                               7%
    55%                                              11%
    60%                                              52%
    65%                                              15%
    70%                                              15%

4.  Target Retirement Age
    Age
    55                                                3%
    60                                               27%
    62                                               18%
    65                                               49%
    75                                                3%

The conclusion from the above is that most hospitals and health systems have supplemental defined benefit plans with a target benefit from 55% to 70%. They usually cover up to five key executives and have a retirement target from 60 to 65 years of age.

000071

## C.   SUPPLEMENTAL EXECUTIVE RETIREMENT PROGRAMS (SERP)

As previously discussed, the most widespread non qualified plans are benefit restoration plans, which make up for government limits on qualified plan benefits to senior management. Some board members think of SERP plans for key executives as not-for-profit deferred compensation in lieu of stock options from for-profit hospital and health system chains.

The primary reasons most hospital boards provide Supplemental Executive Retirement Programs (SERPs) are to:

- Attract and retain high caliber senior management by rewarding management performance.
- Focus management's attention on long term goals and performance.
- Provide SERP participants with a significant level of retirement income.

Employer sponsored programs are intended to provide deferred compensation for key and/or highly paid employees. They are exempt from most of the requirements of the Employee Retirement Income Security Act of 1974 (ERISA). Any private, not-for-profit employer may establish an unfunded or funded "non-qualified deferred compensation" (NQDC) arrangement for a select group of its management or its highly compensated employees. The regulations for this type of deferred compensation arrangement are outlined under the IRS code section 457.

There are two types of deferred compensation plans under section 457. Under both types, contributions remain the property of the employer until paid to the participant.

1. "Eligible" 457(b) plan
    - $7,500 limit per year on contributions.
    - Limit is reduced by contributions to tax sheltered annuities.
    - Contributions may be vested without adverse tax consequences.
    - Contributions and investment income are subject to the claims of the Medical Center's creditors.
    - Many hospitals use the "eligible" 457 plan for the first $7,500 of the deferred bonus plan by placing this portion of the benefit in a "Rabbi Trust".

2. "Ineligible" 457(f) plan
    - No limit on contributions.
    - No adverse tax consequences so long as deferred compensation is subject to a "substantial risk of forfeiture" (not vested).
    - Contributions and investment income are subject to the claims of creditors and to a "change of heart" risk from the employer.
    - A "substantial risk of forfeiture" exists if payment of benefits to the executives is conditioned on the "future performance of substantial service". (This is typically greater than two years.)
    - Once vested, then the participant is taxed immediately on the present value of accrued benefits.

It should be noted that a 457(f) plan participant is required to maintain service with the employer until a stipulated date or length of service; otherwise, he forfeits what has been accumulated in the plan up to that time, should he terminate employment prior to that date. Hospitals often require a five to ten year length of

4

000072

service before the participant is vested. This provides a strong incentive for key employees to remain with the hospital or health system.

Whenever the senior manager becomes vested, those contributions in the ineligible 457(f) plan come under the control of the executive and are immediately taxable, as are future annual contributions by the Medical Center. The tax consequences to the executive then become:

1. Regular Employee Pension Plan portion becomes taxable at retirement if payment is lump sum; or is taxable with annual or monthly pensions, if paid out over a number of years.

2. The $7,500 contribution to the 457(b) plan becomes taxable upon distribution to the executive. This can be at vesting or at retirement. (One point to note is that contributions to the 457(b) plan are not reported on the individual 990 forms until distributions are made. 457(f) contributions are reported on the 990 forms at the time of contribution and distribution.)

3. Contributions to the 457(f) plan become taxable to the executive at the time of vesting or retirement, which ever comes first.

Hospitals and Health Systems that vest their key executives after a certain number of years often "Gross Up" the income tax consequences for the individual executives at the time of vesting, as well as in the years after vesting and before retirement. The reason for this is that if a significant amount of money is being placed in a deferred compensation program each year, it can be difficult for the executive to pay the taxes due each year without withdrawing a significant portion of the dollars that have been deferred in order to pay the taxes.

### D.    PROPOSED COURSE OF ACTION

Duncan, I would suggest that we have a meeting with the Chairman of the Board to review the overall SERP program and determine:

1. Feasibility of Initiating a SERP Program.
2. What Executives Should Participate.
3. Defined Benefit Targets.
4. Length of Time for Vesting.
5. Possibility of Income Tax Gross Up.
6. Company to Handle the SERP Program.
7. Responsibility of the TMRMC Board Executive Committee in Overseeing the Program.

Based upon a very brief review of TMRMC's financial and marketing results, it is obvious that you and your senior management are performing in the upper quartile of comparable Hospital and Health Systems performance. A profit of $13.5 million in net revenues of $260 million is very good, particularly considering that gross revenue is approximately $500 million. It is difficult to maintain profitability with the amount of unreimbursed income and bad debt that you have. When one considers the heavy HMO market penetration in the area, profitability becomes even more difficult. With an 80% market share in an area with a Columbia/HCA Regional Office is almost unheard of! If a large not-for-profit medical center such as TMRMC has over a 60% market share in an area competing with a Columbia/HCA hospital and a Health South Rehab facility, the not-for-profit facility is doing extremely well.

5

000073

When we meet with your Board Chairman, I will recommend that we consider the following:

1. CEO have a SERP target of 50% of salary at 10 years and 65% at 15 years. He would be vested at 10 years.

2. The two Executive Vice Presidents have a SERP target of 50% of salary and be vested at 15 years.

3. The Senior Vice Presidents and Vice Presidents maintain the same formula of 1.5% per year times number of years times last three years average salary (but without the $150,000 limitation).

I should also review your contract to determine how any proposed SERP changes should be incorporated into the contract. I can also compare it to other similar CEO contracts that I have reviewed.

After the Board Chairman, you and I have reviewed this letter and developed a plan of action, we should review our findings and recommendations with the Executive Committee of the Board. The Executive Committee should draw the final conclusions and approve or disapprove the proposed Supplemental Executive Retirement Program.

After you have had an opportunity to review this letter, I will give you a call.

Warm personal regards,

Paul M. Flood, C.M.C., A.A.H.C.
Chairman
Chattahoochee Health Resources

6

000074

# Chattahoochee Health Resources

*[handwritten: 13]*

May 18, 1998

*[handwritten notes in right margin:*
*NEW*
*1. DUNCAN'S CONTRACT*
*2. SEVERANCE 2YRS → SHOULD BE 5*
*3. BASE $380,000 +100,000 → MATCH BY HDR ∴ 100+100 = $480,000  $200,000 (450-P PLANS) → 2 #4M NOW*
*4. CURRENT EXEC COMM OF BD.*
*• CHMN – SUPER WISE – LITTLE YOUNGER THAN PURCHASE*
*• VASCULAR SURG – PASSIVE WILL FOLLOW*
*• SUNTRUST BK – V.P. BEING IN REAL ESTATE ] SUPPORTIVE $95K*
*• CEO OF MFG. Co.– A STRONG SUPPORTER ($125K)*
*5. DUNCAN – $ IN 75th PERCENTILE – DOES NOT LIKE BONUS/INCENTIVES ]*

John Lewis, Ph.D.
Chairman
Board of Directors
Tallahassee Memorial HealthCare, Inc.
1300 Miccosukee Road
Tallahassee, FL  32308-5093

Dear Dr. Lewis,

As requested by you, I am enclosing information from my brief review of your Employee Pension Plan and its impact on senior management deferred compensation.

## A.   TMH, Inc. EMPLOYEE RETIREMENT PROGRAM

Your CEO and senior management team participate in TMH, Inc.'s regular employee retirement program. This program is designed to pay employees 1.5% per year (of the employee's last three years average salary up to $150,000) times the number of years employed at TMH, Inc.  For example, if a nurse or therapist averaged $50,000 their last three years of employment and worked for 15 years, their retirement income would be:

1.5% x 15 years x $50,000 + Social Security ($20,000 estimate) = $11,250 + $20,000 = $31,250 or
62.5% of salary.

If an upper middle manager worked 25 years and earned $100,000 average the last three years, his/her retirement would be:

1.5% x 25 years x $100,000 + Social Security = $37,500 + $20,000 = $57,500 or
57.5% of direct compensation.

On the other hand, if your CEO retired after 15 years (he would be approximately 62), his TMH, Inc. retirement program based upon his current compensation would be:

1.5% x 15 years x $150,000 (plan maximum) + Social Security = $33,750 + $20,000 = $53,750 or
11.7% of direct compensation.

If he stayed until he were 65 years old (18 years), assuming current compensation level, his retirement income would be $60,500 or

13.2% of direct compensation.

Another example would be your Chief Financial Officer, who earns approximately $235,000 per year. Assume he retires with 25 years of service with TMH, Inc.  His retirement income would be:

1.5% x 25 years x $150,000 + Social Security = $56,250 + $20,000 = $76,250 or
32.4% of direct compensation.

*[handwritten:*
*LYNNE WRIGLEY 404+365-1912*
*TOWERS PERRIN*
*LEEANN EARLY 404+874-8500]*

1

000075

As you can see, the TMH, Inc. pension plan works quite well for the rank and file employees. However, once an executive or senior manager earns over $150,000 per year, retirement income as a percentage of salary or direct compensation drops significantly.

Today the average employee retiring has worked at TMH, Inc. 22 years and has earned approximately $45,000 average over the last three years. He/she therefore retires with an average retirement pay of $34,850 per year or 77% of final annual salary.  (1.5% x 22 years x $45,000 + $20,000 social security.)

Since the Tax Reform Act of 1986, both hospitals as well as public and private companies have faced the dilemma of how to equalize their retirement programs so that key executives maintain a similar standard of living in retirement as they did while working, by receiving a percentage of their final annual salary that is comparable with the percentage of salary that regular employees receive.

As at TMH, Inc. most employer sponsored retirement plans qualify for federal tax advantages. However, these plans have strict limits on how much employees and employers can invest in pension and 401(K) funds. While rank-and-file employees are generally unaffected by such limits, the TEFRA Act places a $150,000 limit on "highly paid" executives.

As indicated in the previous examples, the TMH, Inc. funded pension plan will provide most employees with a significant percentage of their salary after retirement, particularly when one adds social security benefits. Retired executives, however, will receive a much lower percentage of their final salary because of the federal caps on employer contributions and payouts.

Although I have not analyzed individual benefits of those who have retired recently, it appears the objective of the TMH, Inc. pension plan is for employees to retire with a target between 60% and 70% of final pay. It stands to reason that executives should have a similar or higher retirement target as rank-and-file employees.

B.   **HOSPITALS RESPONSE TO TEFRA**

Since the TEFRA caps were put in place, there has been a steady erosion in what hospitals and private companies can provide for executives through a qualified employee pension plan. In response, many hospitals and companies have fashioned "non qualified" executive plans outside traditional retirement plan boundaries, which are subject to less Internal Revenue Service regulations and try to match or exceed the salary to benefit ratio of other employees. In reality, this is giving back to executives something that they already had before the federal caps.

72% of the respondents in a 1997 William M. Mercer survey reported that their commitment to a non qualified executive retirement plan - one that doesn't qualify for traditional tax advantages - was driven by a tax code that discriminates against high salaried employees. Their wide spread popularity in healthcare, as well as the private sector, is also a testament to the premium that most board of directors place on assembling a cadre of quality executives. Many board members have made the comment, "To get a good management team and retain it," is the real prize for an effective supplemental executive retirement program (SERP).

Every year I do a survey in Georgia of hospitals and health systems that have in excess of 250 operating beds in the main hospital. Of these twenty (20) hospitals, eighteen (18) have some form of a supplemental executive retirement program. Thirteen (13) have defined benefit plans and five (5) have significant defined contribution plans. The defined benefit plans have the following targets as a percentage of final compensation.

2

| 50% | 55% | 60% | 65% | 70% | Total |
|-----|-----|-----|-----|-----|-------|
| 2 | 2 | 2 | 3 | 3 | 13 |

Three (3) hospitals have defined contribution plans with targets ranging from $1.25 million to $2.5 million at retirement. Three (3) others have various types of defined contribution plans. Of the two (2) hospitals that have only employee pension plans, one is in the process of implementing a defined benefit plan with a target of 65% of direct compensation for the CEO.

Two recent surveys by KPMG Peat Marwick and Arthur Anderson indicated that 90% of the Fortune 1000 companies offer executives some degree of supplemental benefits beyond the standard menu of retirement options. Towers Perrin also conducted an informal survey of supplemental, non qualified retirement plans and deferred compensation arrangements for 51 non-profit hospital and health systems. Their study indicated the following:

1.  Number of Executives Covered
    One (CEO)                                                34%    56% 1 & 5
    Two to Five                                              22%
    Six to Ten                                               20%
    More than Ten                                            24%

2.  Plan Structure
    Supplemental Defined Benefit or Target Benefit          78%    SERP DEF BEN 78%
    Supplemental Defined Contribution                       10%
    Deferred Compensation                                   12%

3.  Defined Benefit Target
    Target
    50%                                                      7%
    55%                                                     11%
    60%                                                     52%
    65%                                                     15%    30% 65%/70%
    70%                                                     15%    OVER

4.  Target Retirement Age
    Age
    55
    60                                                       3%
    62                                                      27%
    65                                                      18%
    75                                                      49%
                                                             3%

The conclusion from the above is that most hospitals and health systems have supplemental defined benefit plans with a target benefit from 55% to 70%. They usually cover up to five key executives and have a retirement target from 60 to 65 years of age.

## C.   SUPPLEMENTAL EXECUTIVE RETIREMENT PROGRAMS (SERP)

As previously discussed, the most widespread non qualified plans are benefit restoration plans, which make up for government limits on qualified plan benefits to senior management. Some board members think of SERP plans for key executives as not-for-profit deferred compensation in lieu of stock options from for-profit hospital and health system chains.

3

000077

The primary reasons most hospital boards provide Supplemental Executive Retirement Programs (SERPs) are to:

- Attract and retain high caliber senior management by rewarding management performance.
- Focus management's attention on long term goals and performance.
- Provide SERP participants with a significant level of retirement income.

Employer sponsored programs are intended to provide deferred compensation for key and/or highly paid employees. They are exempt from most of the requirements of the Employee Retirement Income Security Act of 1974 (ERISA). Any private, not-for-profit employer may establish an unfunded or funded "non-qualified deferred compensation" (NQDC) arrangement for a select group of its management or its highly compensated employees. The regulations for this type of deferred compensation arrangement are outlined under the IRS code section 457.

There are two types of deferred compensation plans under section 457. Under both types, contributions remain the property of the employer until paid to the participant.

1. "Eligible" 457(b) plan
   - $7,500 limit per year on contributions.
   - Limit is reduced by contributions to tax sheltered annuities.
   - Contributions may be vested without adverse tax consequences.
   - Contributions and investment income are subject to the claims of the Medical Center's creditors.
   - Many hospitals use the "eligible" 457 plan for the first $7,500 of the deferred bonus plan by placing this portion of the benefit in a "Rabbi Trust".

2. "Ineligible" 457(f) plan
   - No limit on contributions.
   - No adverse tax consequences so long as deferred compensation is subject to a "substantial risk of forfeiture" (not vested).
   - Contributions and investment income are subject to the claims of creditors and to a "change of heart" risk from the employer.
   - A "substantial risk of forfeiture" exists if payment of benefits to the executives is conditioned on the "future performance of substantial service". (This is typically greater than two years.)
   - Once vested, then the participant is taxed immediately on the present value of accrued benefits.

It should be noted that a 457(f) plan participant is required to maintain service with the employer until a stipulated date or length of service; otherwise, he forfeits what has been accumulated in the plan up to that time, should he terminate employment prior to that date. Hospitals often require a five to ten year length of service before the participant is vested. This provides a strong incentive for key employees to remain with the hospital or health system. *Could run $5% to 65% than the inclusive*

Whenever the senior manager becomes vested, those contributions in the ineligible 457(f) plan come under the control of the executive and are immediately taxable, as are future annual contributions by the Medical Center. The tax consequences to the executive then become:

1. Regular Employee Pension Plan portion becomes taxable at retirement if payment is lump sum; or is taxable with annual or monthly pensions, if paid out over a number of years.

2. The $7,500 contribution to the 457(b) plan becomes taxable upon distribution to the executive. This can be at vesting or at retirement. (One point to note is that contributions to the 457(b) plan are not reported on the individual 990 forms until distributions are made. 457(f) contributions are reported on the 990 forms at the time of contribution and distribution.)

3. Contributions to the 457(f) plan become taxable to the executive at the time of vesting or retirement, which ever comes first.

Hospitals and Health Systems that vest their key executives after a certain number of years often "Gross Up" the income tax consequences for the individual executives at the time of vesting, as well as in the years after vesting and before retirement. The reason for this is that if a significant amount of money is being placed in a deferred compensation program each year, it can be difficult for the executive to pay the taxes due each year without withdrawing a significant portion of the dollars that have been deferred in order to pay the taxes.

D.  **PROPOSED COURSE OF ACTION**

Dr. Lewis, I would suggest that we have a meeting with the Executive Committee of the Board to review the overall SERP program and determine:

1. Feasibility of Initiating a SERP Program.   *YES*
2. What Executives Should Participate.   *CEO, EVP-2, SVP-2, ALL VPS*
3. Defined Benefit Targets.   · *BELOW*
4. Length of Time for Vesting.   *BELOW*
5. Possibility of Income Tax Gross Up. —— *YES?*
6. Company to Handle the SERP Program.
7. Responsibility of the Tallahassee Memorial HealthCare, Inc. Board Executive Committee in Overseeing the Program.   *ANNUALLY*        *INCENTIVE BONUS - Also.*

Based upon a very brief review of TMH, Inc.'s financial and marketing results, it is obvious that your CEO and senior management are performing in the upper quartile of comparable Hospital and Health Systems performance. A profit of $13.5 million in net revenues of $260 million is very good, particularly considering that gross revenue is approximately $500 million. It is difficult to maintain profitability with *589 BEDS* the amount of unreimbursed income and bad debt that you have. When one considers the heavy HMO market penetration in the area, profitability becomes even more difficult. With an 80% market share in an area with a Columbia/HCA Regional Office is almost unheard of! If a large not-for-profit medical center such as TMH, Inc. has over a 60% market share in an area competing with a Columbia/HCA hospital and a Health South Rehab facility, the not-for-profit facility is doing extremely well.

When we meet, I would recommend that we consider the following:

*APPROVED* CEO have a SERP target of 50% of salary at 10 years and 65% at 15 years. He would be vested at 10 years.

*APPROVED* *FOUR SENIOR* The ~~two Executive~~ Vice Presidents have a SERP target of 50% of salary and be vested at ~~15~~ 10 years.

*NO CHANGE* 3. The ~~Senior Vice Presidents and~~ Vice Presidents maintain the same formula of 1.5% per year times number of years times last three years average salary ~~(but without the $150,000 limitation).~~

*CFO = 1.5% × 25 YRS × $235,000 $20,000 SS*
*.015*
*= $88,125 + 20,000 = $108,125     46%*

*35 YRS = 143,395     61%*

I should also review the CEO contract to determine how any proposed SERP changes should be incorporated into the contract. I can also compare it to other similar CEO contracts that I have reviewed. 

After you have reviewed this letter and developed a plan of action, we should review our findings and recommendations with the Executive Committee of the Board and/or the full Board. The Executive Committee should draw the final conclusions and approve or disapprove the proposed Supplemental Executive Retirement Program.

After you have had an opportunity to review this letter, I will look forward to hearing from you or Duncan Moore.

Warm personal regards,

Paul M. Flood, C.M.C., A.A.H.C.
Chairman
Chattahoochee Health Resources

cc: Mr. Duncan Moore, President & CEO

6

000080



## Chattahoochee Health Resources

July 31, 1998                              *PROPOSED CONTRACT*

Mr. Duncan Moore
CEO
Tallahassee Memorial HealthCare, Inc.
1300 Miccosukee Road
Tallahassee, FL 32308-5093

Dear Duncan,

After reading your current Agreement, I have proposed some of my initial thoughts for updating and adding a number of paragraphs to a revised or updated Agreement. We obviously need to add the final approved additions for the Supplemental Executive Retirement Plan and any other compensation issues that should be included. This can be done in paragraph 4. Some of these proposed paragraphs may be too detailed, or may stretch a point too far.

After you have had an opportunity to review this, we should obviously discuss your thoughts.

Based upon our telephone conversation on Thursday, I will quickly finalize the dollar requirements on the SERP Program. I look forward to talking with you soon.

Warm personal regards,

Paul M. Flood, C.M.C., A.A.H.C.
Chairman
Chattahoochee Health Resources

1) SEVERANCE → 3 - 4 YES
        OK

   • Include ability to ~~stretch~~ stretch
     4 Yrs @ 100% to 8 Yrs @ 50% Compensation Targets
   • or Lump Sum

2) COMPENSATION DEFINITION

   • Include all salary (Compensation reported on 990s)
     exclusive of dues
   • Current base Compensation + other Comp." = Tot. Comp.
     - $100,000 Salary Hotel

000081

# EMPLOYMENT AGREEMENT COMMENTS
## BETWEEN DUNCAN MOORE AND
## TALLAHASSEE MEMORIAL REGIONAL MEDICAL CENTER

## INTRODUCTION

Should a revised contract be between Tallahassee Memorial HealthCare and Duncan Moore, rather than Tallahassee Memorial Regional Medical Center?

In an updated contract, there could be such language as follows:

- Whereas Moore has served as chief executive officer (CEO) of Tallahassee Memorial Regional Medical Center and now Tallahassee Memorial HealthCare (should explain this transition as well as indicate any other corporate entities that Moore is CEO of) and
- Whereas, the Board of Directors of Tallahassee Memorial HealthCare recognizes that Moore has rendered valuable service as CEO from January 29, 1988 as its chief executive officer, enabling employer to fulfil its charitable mission, become financially sound and provide healthcare services to the community within its service area; in addition, employer is cognizant that the present period of time is one of tremendous change for the healthcare industry and employer desires to ensure Moore's continued employment as its CEO during this period and beyond; and
- Whereas the Board of Directors and Moore entered into a contract of employment dated January 29, 1988 which was assumed by the employer on January 30, 1988; and ?
- Whereas, in order to better ensure continued valuable service by Moore in the employ of employer, recognizing that Moore's value to the employer and his productivity in his position will be enhanced by providing additional financial security to him with respect to changes in the nature of employer's business or Moore's possible retirement, termination without cause or disability; and
- Whereas, employer and Moore believe that their relationship will be enhanced by integrating and superceding the previous contract into and by this contract with the respect to the subject matter hereof.

NOW, THEREFORE, in consideration of the premises and of the agreements and commitments made by the parties to this contract, the parties agree as follows:

## 1.   EMPLOYMENT:
Employer hereby agrees to the continued employment of Moore pursuant to the terms hereof and Moore hereby agrees to continue his employment with the employer upon the terms and conditions set forth in this agreement.

## 2.   TERMS:
This agreement shall be for an indefinite term unless terminated as provided herein.

## 3.   PURPOSE:
(Duncan, you may or may not want to change the purpose as outlined in the original agreement.  Your duties as outlined are more "in line" with the responsibilities of a Medical Center CEO rather than a corporate CEO who directs a healthcare system which includes a large Medical Center.  You may want to consider some of the thoughts and words that follow.  If you want to make a change, we should probably discuss what you see as your key duties and responsibilities today and if any of them should be included in the contract.  Some initial thoughts on this follow.)

1

Moore shall be employed as the chief executive officer, regardless of how titled, of Tallahassee Memorial HealthCare, Inc., and such other corporations as are created and controlled from time to time by employer. Moore shall devote substantially all of his entire time, attention, and energies to the affairs of the employer and shall not during the terms of this contract be engaged in any substantial outside business activity; but this requirement shall not be construed as preventing Moore from usual and ordinary social and recreational activities nor shall the same be construed as preventing Moore from investing and managing his assets in such a manner as will not interfere with the duties and obligations of a full-time chief executive officer of a Healthcare System and Medical Center. Without limiting the general terms of the duties described hereinabove, it is further agreed that Moore shall carry out the normal duties of a chief executive officer of a similar sized Regional Healthcare System and Medical Center with similar organization (as in effect from time to time), that he shall perform in a reasonable manner all of the duties required by the employer and that he shall also provide the services required of the chief executive officer by the By-laws of the employer, its affiliates and their successors in reorganization.

**4.  COMPENSATION:**
(Based upon the final outcome of the Supplemental Executive Retirement Program proposal to the Compensation Committee, we should either add to or rewrite this section.)

**5.  BENEFITS:**
In addition to the compensation described above, employer should provide to Moore the following benefits:

    1.    **General Employee Benefits.** Moore shall be included under all standard employee benefit programs now in effect or to become in effect during the term of this Contract, including health and life insurance programs, retirement programs, provisions for sick leave and any and all other standard employee benefit programs. Moore and his family shall be fully included and insured as beneficiaries or covered lives under Employer's current health insurance plan or program up to age 65 and until Moore and his spouse are eligible to receive Medicare insurance benefits, regardless of whether this Contract is terminated prior to such date; provided, however, in the event this Contract is terminated voluntarily by Moore prior to Moore or his spouse reaching age 65, Moore and his dependent family shall be entitled to continue participation in Employer's health insurance plan or program by paying that portion of the cost of such health insurance plan or program attributable to Moore and his dependent family at the rate paid by other employees. As an illustration and not a limitation of the foregoing provisions of this paragraph, in the event of a termination hereof, whereunder Moore is entitled to severance benefits, before either he or his spouse are eligible for Medicare insurance benefits, Employer will continue to pay the cost of such insurance plan or program attributable to Moore and his family. Similarly, in the event of Moore's retirement at a time while either he or his spouse are ineligible for Medicare, Employer will continue to pay the cost of such program attributable to Moore and his family until each of Moore and his spouse, respectively, are eligible to receive Medicare insurance benefits. As long as this Contract remains in effect, Employer shall pay the cost of above health and life insurance for Moore and his family coverage, as well as the cost of the other employee benefit programs referred to herein, provided that Moore will be required to pay such portion of the cost of life insurance coverage that he elects to maintain under the group life insurance program maintained by Employer and to pay the mandatory employee contributions under the retirement plan presently sponsored by Employer if there are any, in accordance with the normal practice of the Employer for all officers of Tallahassee Memorial HealthCare. Additional Life Insurance. The Employer shall pay premiums on the $1 million term life insurance policy on the life of Moore at standard rates (Duncan, this is where we should add any additional insurance policies to cover life, accident, and disability.)

2

000083

3. **General Liability Insurance.** The Employer shall continue to insure Moore under its general liability insurance policy for all acts done in good faith during the term of this Agreement.

4. **Retirement Benefits.** (We will want to expand on retirement benefits and possibly place this under 4, Compensation.)

5. **Automobile.** The Medical Center shall purchase or lease for Moore every three (3) years a new automobile. In the event that the Internal Revenue Service (IRS) changes its rules concerning automobiles, then an adjustment shall be made in Moore's compensation for such changes to offset additional expense to Moore.

6. **Disability Insurance Policy.** (The current Contract indicates that the Employer shall purchase a standard disability policy which shall cover 60% of the base pay of Moore in the event that Moore becomes disabled. This appears to be open ended. Is this until you die or does it go on until Mary Ann dies, if you die first? Should we try to incorporate something that would continue your current total compensation as described in paragraph 4, Compensation for a period of 6 months after becoming permanently disabled and then having the insurance policy pick up at 60% of total compensation not just base pay. We should also include, "This disability income is in addition to any other disability benefits described herein or in any other benefit plan maintained by the Employer.")

7. **Death During Employment.** If Moore dies during the term of his employment, in addition to the benefits payable under general employer benefits, additional life insurance, and accrued vacation payable under paragraph 4 hereof, the Employer shall pay to his beneficiary the compensation that would otherwise be payable to Moore for a 3 month period immediately after his date of death. Additionally, Moore's surviving spouse on her behalf and on behalf of Moore's family members shall have the right until such time as she is eligible to receive Medicare insurance benefits to continue to participate as covered lives and beneficiaries under the Employers health insurance plan by paying therefore at the rate paid by employees of the Employer.

8. **Medical Examination.** The Employer shall provide one (1) annual medical examinations per year for Moore.

9. **Dues.** The Employer shall pay dues to professional associations and societies and to such service organizations and clubs of which Moore may become a member, ~~as approved by the Chairman of the Board or the Executive Committee of the Board of Directors as being in the best interest of the Employer.~~

10. **Expenses.** (Duncan, after 10 years, I am not sure if you need this paragraph or blend this paragraph in with dues above, but in case you think it might be advisable to do so, this is a good proposed paragraph on expenses.) Moore will be permitted to be absent from Employer's business during working days to attend professional meetings in the United States and elsewhere and to attend to such outside professional duties in the healthcare field as have been mutually agreed upon between him and the Chairman of the Board or the Executive Committee of the Board of Directors. Attendance at such approved meetings and accomplishment of approved professional duties shall be fully compensated service time and shall not be considered vacation time. It is deemed to be in the best business interest of the Employer that Moore's spouse accompany him at such of said approved meetings as may be selected in Moore's discretion. Moore is authorized to incur reasonable expenses for travel for himself and his spouse and similar items. The Employer shall reimburse Moore for all expenses incurred by him and his spouse incident to attendance at approved professional meetings and accomplishment of approved professional duties and such entertainment expenses incurred by Moore in furtherance of the Employer's interest, provided, however, that such reimbursement is approved by the Chairman of the Board and provided further that in any case where Moore anticipates that the travel costs or incidental expenses connected with any of the above-described activities

3

may exceed $5,000.00, then Moore shall obtain the prior approval of the Chairman of the Board.

**6 VACATION 'LEAVE TIME**
(Duncan, your current Contract indicates that you are entitled earn time off (ETO) in accordance with the Employer's personnel policies for each year of employment. Often, vacation and sick leave are broken out in Contracts similar to the two provisions indicated below.)

**6a. Vacations:** Moore shall be entitled to 5 weeks (or whatever the appropriate number is) of vacation per fiscal year, during which his compensation shall be paid in full. Each vacation shall be taken by Moore at the time he and the Chairman determine appropriate, taking into account the requirements of the Employer. At the election of Moore (exercisable by letter to the Chairman not more frequently than once per fiscal year) up to, but not more than, three (3) weeks of said five (5) weeks of vacation (that is fifteen (15) working days per fiscal year) which have been accrued under the Employers "Paid Days Off Policy" provisions as the same may be in effect and as published from time to time, shall be applied by the Employer and paid as additional payments toward the dollar match retirement option (or however we might say this – particularly if it is included in the Contract in any particular paragraph) in lieu of Moore's taking the corresponding time off. Provided further, any unused balance in Moore's paid days off account may be accumulated or accrued by Moore without limit until termination of this Contract, whether voluntarily or involuntarily by either party, in which event Moore or his beneficiary (in the event of Moore's death) shall receive an amount of money equal to Moore's annual salary prorated against the accumulated and unused balance. Moore or his beneficiary may elect a lump sum payment or equal monthly payments over a period of twenty-four (24) months of the sum due him for unused paid days off account balance.

**6b. Sick Leave:** In the event of absence as the result of illness or injury (arising from any cause and without regard to whether or not resulting in permanent disability) on Moore's part, the Employer will continue Moore's compensation and expenses for a period of six (6) months at which time the Employer will pay Moore one-half (1/2) the compensation for an additional six (6) months or until such time that permanent disability payments are initiated pursuant to the disability provisions of the defined benefit requirement plan maintained by Employer. Any salary continuation required of the Employer during the pendency of said retirement plan disability benefits shall be in addition to the amount of any disability income paid Moore pursuant to the insurance policies described in above paragraph 4.

## 7. TERMINATION:
(Duncan, I would advise strengthening the termination clause in your current Contract as follows:)

**7A. Termination Without Cause By Employer:** The Employer may in its discretion terminate Moore without cause. Such action shall require a majority vote of the entire Board of Directors of the Employer and become effective when such vote is taken. After such termination, all rights, duties, and obligations of both parties shall cease, except as otherwise especially provided herein, and except that Employer shall pay to Moore any compensation due Moore as of the effective date of termination and Employer shall pay to Moore during the "severance compensation period" (as defined below) from and after the effective date of termination those amounts described in the compensation sections (paragraph 4) of this Contract which amount shall be collectively referred to herein as "severance compensation", together with those amounts required to be paid to Moore

4

pursuant to the deferred compensation section 4 of this Contract. * The severance compensation provided under this paragraph 7A shall not be paid in the event Moore's termination of employment is for cause as provided under paragraph 10A hereof.

* Note to Duncan: This means we need to spell out that all of your total compensation will be included in a severance package.

In the event the termination occurs between the effective date hereof through and including September 30, 2003, the severance compensation shall be paid for a term of four (4) years. In the event the termination occurs between October 1, 2003 and September 30, 2004, the severance compensation shall be paid for a term of three (3) years. In the event the termination occurs between October 1, 2004 and September 30, 2005, the severance compensation shall be paid for a term of two (2) years. In the event the termination occurs between October 1, 2005 through and including September 30, 2006, the severance compensation shall be paid for a term of one (1) year. The obligation of Employer to pay severance pay shall terminate at the end of severance period described above or on September 30, 2006 whichever occurs first. Whenever a reference in this Contract is made to the "severance compensation period" the same shall refer to the time frame set forth in this paragraph.

The severance compensation will be paid on the first (1st) date of each month, beginning with the first month following notice of termination and continuing thereafter during the severance compensation period. During the severance compensation period, Moore shall not be required to perform any duties for the Employer (except as provided in paragraph 7A point d below) or come to Employer's business or the business of any of its affiliates. Neither shall the fact that he seeks, accepts, and undertakes other employment during this period affect Employer's obligation to make the severance compensation payments. Also, the Employer agrees to keep Moore's group life, health and major medical insurance coverage paid-up and in effect during the severance compensation period. During the severance compensation period Moore shall also be credited with service for purposes of calculating length of service under the Employer's defined benefit pension plan. The consideration running to the Employer from Moore for the payments contemplated under this paragraph 7A and following paragraph 8, the receipt, value, and sufficiency of which are hereby acknowledged, includes, but is not necessarily limited to:

a. The performance of services by Moore for the Employer for an uninterrupted period dating from January 29, 1988.

b. The desire of the Employer to retain Moore in its employ as a strong and effective chief executive officer, acknowledging his effectiveness may require his making decisions, which, although in the best interest of the Employer in light of information and expertise personal to Moore, may be unpopular with the public, including physicians on the Medical Staff and members of the Board of Directors of the Employer.

c. The severance compensation provisions of this Contract are expressively determined to be an effective and appropriate method to fulfil the competing desires of the Employer to: (i) employ Moore at the pleasure of the Employer's Board of Trustees, and (ii) to retain a dynamic, strong, and effective decision maker in light of the needs and challenges facing a modern, publicly controlled hospital and health system.

d. During the severance compensation period provided for in paragraph 7A and 8 hereof, Moore shall be available to render consulting or Board services to the Employer, provided such consulting or Board duties shall not interfere with Moore's

5

performance of full time employment elsewhere, wherever located, and that he is advanced all of his reasonable expenses, including, but not necessarily limited to, travel, meals, and lodging, relating to such consulting or Board duties.

## 8.   CONSTRUCTIVE TERMINATION:

During the term of this Contract if the following should occur, (i) the Employer in its discretion changes either the nature of Employer's business or Moore's duties so that it can reasonably be found that Moore is no longer performing the duties of the chief executive officer of Tallahassee Memorial HealthCare, Inc., or (ii) constructive termination (as defined below) of this Contract by Employer, than Moore shall have the right in his complete discretion, to terminate performance of all duties, obligations and responsibilities required of Moore under this Contract by delivering to the Chairman of the Board of Tallahassee Memorial HealthCare written notice, stating therein its effective date, of the termination of Moore's obligations, duties and responsibilities under this Contract by reason of Employer's constructive termination. After such notice, all rights, duties and obligations of both Moore and Employer shall cease, except as otherwise expressly provided herein, and except that the Employer shall pay to Moore any compensation due him as of the effective date of his notice and Employer shall also pay to Moore during the severance compensation period from and after the effective date of Moore's notice of constructive termination the severance compensation as fully described in paragraph 7A of this Contract, together with those amounts due Moore pursuant to paragraph 4 on compensation in this Contract. * During this period, Moore shall not be required to perform any duties for the Employer, except as provided in paragraph 7.A.d. above or come to Employer's business. Neither shall the fact that he seeks, accepts or undertakes other employment during this term affect such payment. Also, during the severance compensation period, the Employer agrees to keep Moore's group life, health and major medical insurance coverage paid up and in effect. The severance compensation period shall also be included as full time employment and Moore shall be credited with service therefore for purposes of calculating length of service under the Employer's defined benefit pension plan.

* Duncan, as indicated earlier, we must spell out all of your direct and deferred compensation in paragraph 4 and include all of it in your severance package.

As used herein, a "constructive termination" shall mean and include:
- (i)   A "Change of Control" (as defined below) in or by Employer; or
- (ii)   Any "Change in Duties" (as defined below) of Moore; or
- (iii)   An action whether ratified or confirmed by the Board of Directors of the Employer, whereby the operations of Tallahassee Memorial HealthCare, Inc. are changed to the point that some other entity or provider is the primary operating entity of the acute care general hospital (Tallahassee Memorial Regional Medical Center) rather than the Employer or any of its Affiliates.

For purposes hereof, a "Change of Control" shall be deemed to have occurred if:
- (i)   As the result of, or in connection with, or incident to any tender offer or exchange, offer, merger, joint venture, lease or other business combination (whether or not the Employer converts from a non-profit to a for-profit corporation), sale of assets, contested election, legal or judicial decision, or any combination of the foregoing events, the persons who were Trustees of the Employer before such events shall cease to represent voting control of the Board of Directors of the Employer or any successor to the Employer;
- (ii)   Employer transfers substantially all of its assets to another corporation or other business entity which is not a wholly-owned or wholly-controlled subsidiary of Employer.

6

000087

"Change in Duties" of Moore shall mean any one or more of the following:

(i)     A significant change in the nature or scope of Moore's authorities or duties from those applicable to him immediately prior to the date on which a Change of Control occurs:

(ii)    A reduction in Moore's Compensation from that provided to him immediately prior to the date on which a Change of Control occurs:

(iii)   Any diminution in Moore's eligibility to participate or level of participation, incentive award, and other Compensation plans which provide opportunities to receive Compensation, from the greater of:

      (a)   The opportunities provided by the Employer (including any of the Affiliates) for an executive with comparable duties; or

      (b)   The opportunities under any such plans under which he was participating immediately prior to the date on which a Change of Control occurs.

(iv)    A diminution in Employee benefits (including, but not limited to, medical, dental, life insurance and long-term disability plans) and perquisites applicable to Moore, from the greater of:

      (a)   Employee benefits and perquisites provided by the Employer (including the Affiliates) to executives with comparable duties; or

      (b)   Employee benefits and perquisites to which he was entitled immediately prior to the date on which a Change of Control occurs.

(v)     A change in the location of Moore's principal place of employment by the Employer (including any of the Affiliates) by more than ten (10) miles from the location where he was principally employed immediately prior to the date on which a Change of Control occurs to which Moore has not agreed:

(vi)    Any reduction in Moore's title with Employer:

(vii)   That Moore, because of any change in circumstances of Employer, is adversely affected with respect to his ability to exercise the authorities, powers, functions, or duties attached to his position immediately prior to the date on which a Change of Control occurs.

## 9.  TERMINATION WITHOUT CAUSE BY MOORE:

Moore may terminate this Contract at any time upon six (6) months written notice to the Board of Directors by registered mail. In such event, Moore if requested by the Employer, shall continue to render his services, and shall be paid his regular Compensation up to the date of termination.

## 10. TERMINATION FOR CAUSE:

A.     This Contract may be terminated by the Employer without notice and with immediate effect for cause in the event of Moore's conviction of a felony. Further, Moore's duties may be suspended without a cessation of his full Compensation or benefits during the pendency, following indictment, of any felony charge brought against Moore in a court of competent jurisdiction. In addition, cause may be defined as the willful neglect * of his duties of employment at Tallahassee Memorial HealthCare, habitual absence, and/or gross and flagrant inattention to duties. * The Board shall notify Moore in writing of termination for cause by registered mail and termination shall be effective as of the date of the receipt by Moore.

B.     The termination of Moore's employment for cause under this Paragraph 10 shall not affect his right to be paid out his deferred compensation in accordance with paragraph 4 hereof.

    * (Duncan, is there anyway to eliminate the "willful neglect" or "flagrant inattention to

7

duties" phrases that are included here because they are in your original contract?  These
can be used as "political loopholes"!)

**11. COMPETITION:**
Upon termination of this Agreement for any reason for a period of one (1) year following the effective
date of this termination, Moore shall not be employed by or work in any capacity for any health care
facility in the Tallahassee area without first obtaining the written authorization of the Chairman of the
Board of Directors of Tallahassee Memorial HealthCare.  The Tallahassee area is hereby defined as Leon,
Jefferson, Taylor and Gadsden Counties, Florida, and Thomas County, Georgia.  In the event of a breach
of this restrictive covenant, TMHC shall be entitled to injunctive relief, it being agreed by the parties that
there would be no adequate remedy at law available to Tallahassee Memorial HealthCare.

**12. REVIEW OF PERFORMANCE ANNUALLY:**
(Duncan, this one seems okay to me and is currently written as follows.)

The Board of Directors shall annually do a performance review which shall include a comprehensive
assessment of achievements on the job, measured by the standards criteria and guidelines developed by
the Board of Directors.  This review process shall include the setting of new goals, standards, and
objectives for the future.

**13. NOTICES:**
Any notice required or permitted to be given under this Agreement shall be sufficient if in writing and
mailed by certified mail, return receipt requested, to the resident's address then on file with the Employer
in the case of Moore and to the Chairman of the Board, care of Tallahassee Memorial HealthCare, Inc.,
1300 Miccosukee Road, Tallahassee, Florida, in the case of Employer.

**14. ENTIRE AGREEMENT:**
This Contract constitutes the entire Agreement between the parties and contains all the Agreements
between them with respect to the subject matter hereof.  It also supercedes and restates any and all other
Agreements or Contracts either oral or written between the parties with respect to the subject matter
hereof.  (I am not sure about the word "oral" in this one as I have not seen any documentation on the
$100,000 match retirement option that you have.)

**15. AMMENDMENTS TO AGREEMENT:**
The terms and conditions of this Agreement may be amended at any time by written agreement of the
parties signed by the Chairman of the Board and Moore.

**16. INVALIDITY:**
The invalidity or unenforceability of any particular provision of this Agreement shall not affect other
provisions and this Agreement shall be construed in all respects as if such invalid or unenforceable
provision had been omitted.

**17. BINDING AFFECT:**
This Contract shall be binding upon and inure to the benefit of the Employer, its successors and assigns,
and shall be binding upon Moore, his administrators, executors, legatees, heirs, and assigns.

**18. ASSIGNMENT:**
Neither party shall assign this Agreement without the written consent of the other party.

8

## 19. LITIGATION COST:

In the event that any dispute hereunder is resolved through litigation, and Moore's position in such litigation is sustained by any extent by the court, then Employer agrees that it shall pay all of Moore's attorneys' fees, court costs, and other out of pocket expenses incurred in connection with the litigation or arbitration.

## 20. ARBITRATION:

Arbitration is not required of Moore to resolve any dispute with Employer hereunder, but is merely an alternative available to Moore to resolve any dispute if Moore elects to use it. Employer shall have no right to avail itself of arbitration unless Moore agrees to arbitration. All arbitration's pursuant to the contract shall be determined in accordance with the rules of the American Arbitration Association then in effect, by a single arbitrator if the parties shall agree upon one, or by three arbitrators, one appointed by each party, and a third arbitrator appointed by the two arbitrators selected by the parties, all arbitrators from a panel proposed by the American Arbitration Association. If any party shall fail to appoint an arbitrator within thirty (30) days after it is notified to do so, then the arbitration shall be accomplished by a single arbitrator. Unless otherwise agreed to by the parties hereto, all arbitration proceedings shall be held in Tallahassee, Florida. Each party agrees to comply with any award rendered in such proceedings. The decision of the arbitrator(s) shall be tendered within sixty (60) days after final submission of the parties in writing or any hearing before the arbitrators and shall include their individual votes. If Moore is entitled to any award pursuant to the determination reached in the arbitration proceeding, he shall be entitled to payment by Employer of all attorneys' fees, costs and other out-of-pocket expenses incurred in connection with the arbitration.

## 21. ASSUMPTION BY SUCCESSOR:

The Employer agrees that it will not merge, consolidate or combine with any other business entity unless and until the succeeding or continuing corporation, authority or business entity shall expressly assume and confirm in writing the obligations of the Employer created for Moore under this Contract. The rights accruing to Moore or any designee under the provisions of this Contract shall be solely those of any unsecured creditor of the Employer.

## 22. APPLICABLE LAW:

This Contract shall be construed and enforced under and accordance with the laws of the state of Florida.

IN WITNESS WHEREOF, the Employer has caused this Contract to be executed by its duly authorized Chairman, attested by like authority and Moore has hereunto set his hand and seal this ____ day of ____, 1998.

000090

# CEO - Serp Analysis

| 12/31 Year | Age | Salary | Final 3 | 401(k) + match | $457(t) | $457(f) no surrender | Split $ - no surrender | Soc-Sec Benefit | Retirent Fund (w/o SocSec) | Total Retirent Income @65 | Current Replacement Ratio | Post Retirement Income Target | SERP amount to fund | Annual Contribution | Serp Fund |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1997 | 52 | 286,881 | 255,574 | 439,580 | 95,500 | 76,850 | 0 | 0 | 611,930 | 159,559 | 62.43% | 178,902 | 19,343 | | 0 |
| 1998 | 53 | 300,000 | 277,773 | 478,113 | 102,185 | 105,414 | 0 | 0 | 685,712 | 167,100 | 60.16% | 194,441 | 27,341 | 33,761 | 33,761 |
| 1999 | 54 | 315,000 | 300,627 | 519,576 | 109,338 | 135,976 | 0 | 0 | 764,891 | 174,201 | 57.95% | 210,439 | 36,238 | 33,761 | 69,885 |
| 2000 | 55 | 330,750 | 315,250 | 564,182 | 116,992 | 168,679 | 0 | 0 | 849,852 | 180,888 | 57.38% | 220,675 | 39,787 | 33,761 | 108,538 |
| 2001 | 56 | 347,288 | 331,013 | 612,157 | 125,181 | 203,670 | 0 | 0 | 941,008 | 187,187 | 56.55% | 231,709 | 44,521 | 33,761 | 149,896 |
| 2002 | 57 | 364,652 | 347,563 | 663,745 | 133,944 | 241,111 | 0 | 0 | 1,038,800 | 193,122 | 55.56% | 243,294 | 50,172 | 33,761 | 194,150 |
| 2003 | 58 | 382,884 | 364,941 | 719,206 | 143,320 | 281,173 | 0 | 0 | 1,143,699 | 198,713 | 54.45% | 255,459 | 56,745 | 33,761 | 241,501 |
| 2004 | 59 | 402,029 | 383,188 | 778,819 | 153,352 | 324,039 | 0 | 0 | 1,256,210 | 203,983 | 53.23% | 268,232 | 64,249 | 33,761 | 292,167 |
| 2005 | 60 | 422,130 | 402,348 | 842,883 | 164,087 | 369,906 | 0 | 0 | 1,376,876 | 208,950 | 51.93% | 281,643 | 72,693 | 33,761 | 346,380 |
| 2006 | 61 | 443,237 | 422,465 | 911,718 | 175,573 | 418,983 | 0 | 0 | 1,506,274 | 213,633 | 50.57% | 295,726 | 82,092 | 33,761 | 404,388 |
| 2007 | 62 | 465,398 | 443,588 | 985,667 | 187,863 | 471,496 | 36,780 | 10,075 | 1,681,806 | 232,999 | 52.53% | 310,512 | 77,513 | 33,761 | 466,456 |
| 2008 | 63 | 488,668 | 465,768 | 1,065,096 | 201,013 | 527,685 | 151,890 | 10,915 | 1,945,684 | 251,344 | 54.09% | 326,037 | 74,094 | 33,761 | 532,868 |
| 2009 | 64 | 513,102 | 489,056 | 1,150,398 | 215,084 | 587,807 | 359,820 | 11,754 | 2,313,109 | 279,553 | 57.16% | 342,339 | 62,786 | 33,761 | 603,930 |
| 2010 | 65 | 538,757 | 513,509 | 1,241,993 | 230,140 | 652,137 | 401,500 | 12,594 | 2,525,770 | 285,884 | 55.67% | 359,456 | 73,573 | 33,761 | 679,966 |

679,966

## SUMMARY:

Form of Income Replacement

Projected Average Salary     513,509

Required Replacement     70%

| | Annual Benefit Life | Annual Benefit CL15 | Annual Benefit CA50% | Annual Benefit CA100% |
|---|---|---|---|---|
| | 359,456 | 359,456 | 359,456 | 359,456 |
| Less: | | | | |
| Social Security | -12,594 | -10,994 | -10,923 | -9,644 |
| 401(k) and Match | -134,384 | -117,306 | -116,556 | -102,903 |
| Section 457 | -24,901 | -21,737 | -21,598 | -19,068 |
| Section 457(f) | -70,562 | -61,594 | -61,200 | -54,032 |
| Split dollar - no surrender | -43,443 | -37,922 | -37,679 | -33,266 |
| Equals: SERP Plan Income Required | 73,573 | 109,904 | 111,501 | 140,544 |
| Level funding contribution Required | 33,761 | 57,774 | 58,992 | 84,222 |

401-K + 457 → KEYSOP.

000091

Serp3 life no surrender

## TALLAHASSEE MEMORIAL HEALTHCARE, INC.
## EXECUTIVE SERP ANNUAL INVESTMENT REQUIREMENTS
### WORK SHEET

### FOR DUNCAN MOORE ONLY

| Executive | Salary Increase Per Year | Number of Years | Compensation at Retirement | Retirement Target | Pension Plan + Soc. Sec. | SERP Short Fall | TMHC Equity Needed at 7% ROI at Retirement | TMHC Annual Investment at 7% |
|---|---|---|---|---|---|---|---|---|
| Duncan Moore | 8% | 8 | $740,800 | $481,520 | $66,420 | $415,100 | $5,930,000 | $578,000 |
| Bill Giudice | 7% | 26 | $1,457,650 | $728,825 | $115,600 | $613,325 | $8,760,400 | $127,600 |
| Ron Bradford | 7% | 19 | $578,650 | $289,325 | $113,200 | $176,125 | $2,516,100 | $67,300 |
| Ed Carney, M.D. | 7% | 10 | $401,300 | $200,650 | $57,100 | $143,550 | $2,050,700 | $148,500 |
| Jack McDonald, M.D. | 7% | ---- | $204,000 | $102,000 | $33,700 | $68,300 | $975,700 | $975,700 |

Total TMHC $921,400/YR w/o Dr. McDonald.
Annual Investment $1,897,100/YR w/o Dr. McDonald.

000092

## Chattahoochee Health Resources

*Ducan's copy BK to PMF*

*D*

June 12, 1998

Mr. Duncan Moore
President & CEO
Tallahassee Memorial Healthcare Inc.
1300 Miccosukee Road
Tallahassee, FL  32308-5093

Dear Duncan,

Enclosed is a proposed letter to Dr. Lewis that I could hand carry to him on the 17th.  Please review and add your percent increase in the last year as well as your years of service in the position.  (I think it is 9 or 10 years, but I am not sure which one.)

Please review and make whatever suggestions and/or additions that you think would be helpful.  Upon finalizing the letter, please indicate which of the four options that you prefer:

- Don't use the letter at all and continue to focus only on the Supplemental Executive Retirement Program.
- Don't give it to Dr. Lewis and the Executive Committee, but just keep it in your "hip pocket" for reference if direct compensation comes up.
- Use the letter with your suggested improvements, and hand carry it to the meeting with copies for each of the Executive Committee.
- Use it with the suggested improvements and FedEx it to Dr. Lewis before the meeting.

I intend to fax a copy of this letter to you by early Friday morning and hopefully can get your comments and suggestions by late Friday morning in case we need to mail or FedEx to Dr. Lewis.  I will give you a call Friday morning.

Warm personal regards,

Paul M. Flood, C.M.C., A.A.H.C.
Chairman
Chattahoochee Health Resources

*Duncan,
Wanda said you were out of town; therefore, we did not fax. You should receive a fed-ex on Monday. I will give you a call in late afternoon. I hope you will be able to seriously ...*

4775 Fowler Drive • Cumming, Georgia 30131 • 770/844-7574 • FAX 770/844-7580

000093

## Chattahoochee Health Resources

**PROPOSED**

**PERSONAL AND CONFIDENTIAL**

June 12, 1998

Mr. John Lewis, Ph.D.
Chairman
Board of Directors
Tallahassee Memorial Healthcare Inc.
1300 Miccosukee Road
Tallahassee, FL  32308-5093

Dear Dr. Lewis,

Often when I meet with ~~Executive Committees or~~ Compensation Committee*s* of ~~the~~ *the* Board regarding Supplemental Executive Retirement Programs (SERP), one of their first questions is how does our CEO's direct compensation compare with presidents and CEOs of similar type and sized healthcare organizations.  I have therefore taken the liberty of developing a comparative analysis for you and the Executive Committee.  I use the Management Science Associates (MSA) National Healthcare Executive Compensation Survey.  This study includes more CEOs and hospital administrative personnel than any other survey in the country.  With 47 states plus the District of Columbia represented, the survey includes multi-hospital corporations, hospital holding corporations, hospitals and medical centers, and integrated healthcare networks.  Nearly 99% are not-for-profit organizations.  The holding corporations tend to own one large acute care facility as their major business but have diversified into other healthcare related ventures.  Since the MSA Survey encompasses more healthcare executives, I feel this is the most reliable and truly reflective compensation study in the country.

Attachment I depicts CEOs of healthcare corporations with greater than $200 million in revenues.  Please note that the total direct compensation at the mean is $459,702; and at the 75th percentile, it is $543,407.  This compares with Duncan Moore's actual total direct compensation of $~~490~~,000.  This places him at about the ~~56~~th percentile in the MSA study.  It is also noteworthy that the average CEO at the mean has been president of his corporation for approximately 7 years.  CEOs at the 75th percentile have been in their position about 11 years.

Revenue responsibility ranges from approximately $536 million to $591 million for the mean and 75th percentile CEOs.  The gross revenue in the Tallahassee Memorial Healthcare Corporation is *slightly in excess of* ~~approximately~~ $500 million.

This analysis indicates that Duncan Moore's CEO compensation is ~~within a comparable range with~~ *below the mean of* similar ~~presidents and~~ CEOs ~~between the mean and 75th percentile.~~ ~~His~~ total direct compensation approximates the 56th percentile.  I hope this analysis is informative.

*When he takes advantage of the dollar match retirement option and the match is considered to be compensation his*

4775 Fowler Drive • Cumming, Georgia 30131 • 770/844-7574 • FAX 770/844-7556

000094

I look forward to meeting with you and the Executive Committee on Wednesday, June 17th at the Medical Center.

Warm regards,

Paul M. Flood, C.M.C., A.A.H.C.
Chairman
Chattahoochee Health Resources

bc:     Mr. Duncan Moore, President & CEO
        Tallahassee Memorial Healthcare Inc.

**PERSONAL & CONFIDENTIAL**

**ATTACHMENT I**

## CEO HEALTHCARE CORPORATIONS > $200 MILLION IN REVENUE

| | MEAN | | 75TH PERCENTILE | | MAXIMUM | | DUNCAN MOORE ACTUAL |
|---|---|---|---|---|---|---|---|
| Current Base Salary | $ | 369,639 | $ | 403,178 | $ | 575,874 | 367,000 |
| Incentive Bonus | | 90,063 | | 140,229 | | 185,203 | -0- |
| Total Direct Compensation | $ | 459,702 | $ | 543,407 | $ | 761,077 | $ ~~480,000~~ (1) |
| *Deferred Savings Match* | | | | | | | 100,000 1 |
| Percent Increase Last 12 Months | | 10.70% | | 15.05% | | 30.70% | |
| Years Service in Position | | 6.9 | | 11.0 | | 14.0 | |
| Revenue Responsibility (Millions) | $ | 536.3 | $ | 591.6 | $ | 2,265.0 | $ 500.0 |

~~(1) $100,000 of the $480,000 placed in a deferred account by Duncan Moore.~~

(1) Moore is offered a deferred savings/retirement plan. For each dollar Moore reserves from his salary TMH provides a one dollar match to a maximum of $100,000. Moore informs me that during his ten years of employment at TMH he has been able to take advantage of this program ~~for~~ four years.

# Chattahoochee Health Resources

September 4, 1998

*[handwritten notes:]* CHUCK MITCHELL   BRENT BROCHARD
JOHN LEWIS   DR TOM LAMBURN
* RISK & CHALLENGES / MARKT SHARE
* SEPARATE CONTRACT
* BEST 3 OF 5 YEARS / BONUS
* DEF OF COMPENSATION - WHATS IN & OUT
* ATTORNEY: JOHN GRAM
* SEVERANCE WELLINGS BURTON
* ANNUAL JOB - PAY DETERMINATION

John R. Lewis, Ph.D.
The Chesley House
401 East Virginia Street
Tallahassee, FL 32301

Dear Dr. Lewis,

## A.   BACKGROUND

At the last meeting of the Compensation Committee of the Tallahassee Memorial HealthCare Board of Directors, you approved the following proposed course of action for developing a Supplemental Executive Retirement Program (SERP) for the CEO and his Senior Vice Presidents:

- The CEO will have a SERP target of 50% of compensation at 10 years and 65% at 15 years. He would be fully vested in the retirement program at 10 years, although payments would not be available to him until he reached the age of 65.
- The four Senior Vice Presidents will have a SERP target of 50% of compensation and be vested at 10 years, although payments would not be available until age 65 if someone retired early.
- You also indicated that the remaining Vice Presidents would stay in the regular employee pension plan with no changes.

You asked that I develop a recommendation on how to fund the approved SERP plan, including any options to "gross up" the benefits, as well as a general outline of the wording to contractually obligate TMHC to the SERP program.

## B.   ANALYSIS OF SERP DOLLAR REQUIREMENTS

This analysis assumes, that each executive will work until he is 65 years old in order to maximize retirement income. I have also used 1998 dollars so the Compensation Committee can compare the dollars needed to fund the SERP program with current dollars in the existing employee pension plan and how all of this relates to current annual salary levels.

Current base compensation and age of the senior executives are:

|  | Base Compensation | Age |
|---|---|---|
| Duncan Moore | $400,248 | 57 |
| Bill Giudice | $251,000 | 39 |
| Ron Bradford | $160,000 | 46 |
| Ed Carney, M.D. | $204,000 | 55 |
| Jack McDonald, M.D. | $204,000 | 65 |

The current employee retirement plan pays 1% of the average annual earnings up to $10,000 and 1.6% of compensation over $10,000 with a cap at $150,000; times the number of years of service at TMHC. The average of the highest 3 of the last 5 years of compensation are used in the calculations. Since all of the 5 executives earn more than $150,000 annually, each are capped at either $2,340 or $2,400 per year (depending if they are on the new or old plan) times the number of service years. In addition to the employee pension plan, each executive would be eligible to draw approximately $22,000 per year in social security, if married at 65.

Based upon current earnings the SERP "short fall" needed to make up the annual difference between Duncan retiring at 65% of compensation and the Senior Vice Presidents at 50% is:

| Executive | Current SERP Retirement Target at 65 | Estimated Employee Pension Plan + Soc. Sec. At Retirement | SERP Short Fall |
|---|---|---|---|
| Duncan Moore | $260,160 | $ 66,460 | $193,700 |
| Bill Giudice | $125,500 | $115,600 | $ 9,900 |
| Ron Bradford | $ 80,000 | $113,200 | --- |
| Ed Carney, M.D. | $102,000 | $ 57,100 | $ 44,900 |
| Jack McDonald, M.D. | $102,000 | $ 33,700 | $ 68,300 |

If each of the executives retired at the end of the fiscal year in which they became 65, the cash flow requirements from TMHC to fund the SERP short fall based upon 1998 dollars would be:

| Fiscal Year | SERP Annual Short Fall | Reason for Change |
|---|---|---|
| 97-98 | --- | |
| 98-99 | $ 68,300 | Dr. Jack McDonald Retires |
| 06-07 | $266,000 | Duncan Moore Retires |
| 08-09 | $306,900 | Dr. Ed Carney Retires |
| 24-25 | $316,800 | Bill Giudice Retires |

You should note that with inflation and compensation increases due to performance, the short fall will increase, but relative to today's dollars, these numbers are reasonably accurate.

## C.   FUNDING OPTIONS

TMHC could develop a 457(f) retirement plan and deposit annual contributions to ensure that there is enough equity in the SERP plan to begin making the SERP payments at the time each executive retired. To accomplish this actuarially, we would estimate average annual raises of approximately 7% and that the equity funds would appreciate approximately 7% each year. This would require an annual investment in the SERP plan of approximately $920,000, if Dr. McDonald was not included in the plan. (Remember this is an incentive plan to retain key executives until they are 65, and Dr. McDonald will be 65 this year.)

A less expensive second option would be to develop a specific contract with those key executives who would be included in the SERP plan to pay them a SERP "short fall" that would provide the CEO with a

2

target of 65% of the average of his last five years of compensation and the other Senior Vice Presidents 50% of theirs. These short falls are described above in Section B. The advantages to this option are:

- It avoids the necessity of investing into an equity fund to have sufficient capital paying dividends or interest to cover the SERP short fall at retirement.
- This option avoids the tax gross up requirements.
- There is no exposure on the 990 forms that must be filed each year.
- This is a far more simple option.

*APPROVED* The executives would become eligible for vesting after ten years of service. Full vesting would occur when one of the following events occurred:

- Either retirement at age 65 or early retirement after age 60.
- *APPROVED* Involuntary termination without cause.
- Death (with a 50% benefit to the wife for her lifetime, provided she has been married to the executive since he became eligible for vesting and does not remarry after his death).

*APPROVED* Payments would be made to each executive for his lifetime. If the executive died before his wife, 50% payments would be made to her for her lifetime provided she remained his widow, without remarrying. If the executive died before his wife reached the age of 60, payments would not be made until she reached the age of 60. If an executive becomes disabled before vesting, the SERP plan would not apply.

D.    RECOMMENDATION

I strongly recommend that the Compensation Committee approve the following resolution:

"Tallahassee Memorial HealthCare, Inc. has approved a Supplemental Executive Retirement Program (SERP) that has a target of 50% of compensation at 10 years of service and a target of 65% of compensation at 15 years of service for its CEO. He will be eligible to become fully vested at 10 years. TMHC also has approved a SERP with a target of 50% of compensation for its Senior Vice Presidents with eligibility for vesting at 10 years. Payments will not be made available until the recipient reaches age 65.

The SERP calculation for retirement purposes will be comprised of:

+ Retirement amount from regular employee pension plan
+ Social Security proceeds
+ SERP short fall
= SERP target percentage of the average of the last
    5 years of salary before retirement, if fully vested.

TMHC will enter into a contract agreement to pay the CEO and the Senior Vice Presidents the SERP targeted percentages of their final average compensation beginning the first month after their retirement and continuing thereafter each month until death of the executive. His surviving widow will be paid 50% of the target until her death, unless she remarries.

The SERP short fall will be paid out of TMHC operating funds from the current year that the expenditures are required, or from any accumulation of SERP funds that have been specifically targeted from preceding years. This plan will become effective October 1, 1998."

3    W/ funding as deemed by CEO & CFO.

000099

*PMF.*

**ATTACHMENT A**

*OFFICER Committee*

**TALLAHASSEE MEMORIAL HEALTHCARE, INC.
CEO CONTRACT
COMMENTS**

*COMP COMMITTEE*

1) SERP WORDING
2) CONTRACT OPTIONS.
3) GOVERNANCE

A.   INCLUDE SERP AGREEMENT IN CONTRACT

B.   OTHER POINTS COVERED IN MANY CEO CONTRACTS

1.A   Direct and deferred compensation as well as benefits are generally described in a little more detail than in Duncan Moore's current contract.

2.A   Paid Days Off (PDO's) and sick leave policies are typically more specific.

3.A   Termination without cause severance period is usually three to five years. Severance benefits should be clearer in the contract.

4.A   Many CEO's have a "constructive termination" clause that covers that Hospital System's change of ownership or contract as well as a significant change in the CEO's duties. *A LOT*

5.   There is generally an arbitration paragraph on how to handle any potential disputes.

(1)  B-A  EXPAND ON PURPOSE - EXPAND ON DUTIES CORP PRESIDENT RATHER THAN HOSPITAL PRESIDENT

1.B  DIRECT COMPENSATION
     DEFERRED COMP SO THERE IS NO MISUNDERSTANDING

2B  PDO  UNLIMITED ACCUMULATION OR ANYTHING OVER A MINIMUM OF "10" DAYS

1C  BENEFITS  • EXTEND HLTH INSUR TO MEDICARE @ AGE 65 FOR EXEC & WIFE
             • IF MOORE VOL TERMINATES CAN PAY HLTH INSUR PORTION AT EMPLOYEE RATE.
             • DISABILITY PARAGRAPH APPEARS OPEN ENDED @ 60%
               (PAY FULL FOR 6-12 MOT., THEN 60% TILL RETIREMENT AGE)
             • DEATH (D-114) BENEFITS PAID AT ½ TO WIFE, COMPENSATION FOR 4
               SHE PAY FOR HLTH BENEFITS AS IF AN EMPLOYEE

3B  SEVERANCE  NOW
               • 1 YR → 3-5 YRS.  • RISK • MGD CARE UNDER DECISION IS BEST INTEREST
                                   • PHY ORG.                              OF TMH
             • HOW TERMINATE - MAJORITY VOTE OF BD ? PROCEDURE
             • DEFINE SEVERANCE PAY SO THERE IS NO MISUNDERSTANDING
             • SPELL OUT REASONS WHY SEVERANCE (FOR OTHERS WHO MIGHT
             •    "      "    CAN'T WORK FOR COMPETITION   READ   )
               DURING SEVERANCE PERIOD